WENDY J. OLSON, IDAHO STATE BAR NO. 7634
UNITED STATES ATTORNEY
**JOANNE P. RODRIGUEZ, IDAHO STATE BAR NO. 2996**
**ASSISTANT UNITED STATES ATTORNEY**
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1414
Joanne.Rodriguez@usdoj.gov

      Attorneys for Defendant


## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ELIZABETH E. MORRIS; and ALAN C. BAKER,<br><br>Plaintiffs,<br><br>     v.<br><br>U.S. ARMY CORP OF ENGINEERS, et al.,<br><br>Defendants. | Case No. 3:13-CV-00336-BLW<br><br>**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 4)** |

**BACKGROUND -** For nearly two centuries, the Corps has played an essential role in developing, managing, and protecting the Nation's water resources.   From the beginning, the Corps has managed and improved navigable waters, and today it is responsible for 25,000 miles of commercial navigation channels and hundreds of locks and dams.   *See* Austin Decl., Ex. 1.   The Corps' water-resource management responsibilities also include flood control (or, more accurately, flood-damage risk reduction).   Today, the Corps has built or controls 14,501 miles of levees, and it maintains and operates more than 702 dams that store more than 100 trillion gallons of water.   Those assets serve purposes ranging from flood control – with benefits to life, property, and the environment – to navigation, water supply, hydropower, and recreation.   Corps facilities store three trillion gallons of municipal and industrial water supplies and provide 24% of the Nation's hydropower capacity.   The Corps also receives 370 million visitors per year to the approximately 4,248 Corps-managed recreation areas.   *Id.*

In the Flood Control Act of 1944 (the Act), "Congress authorized the construction of a number of dam and reservoir projects, operated by the Army Corps of Engineers and producing large blocks of hydroelectric power."   *United States v. City of Fulton*, 475 U.S. 657, 659 (1986). The Act also authorizes the U.S. Army Chief of Engineers to "construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of the Army."   16 U.S.C. § 460d.   The Act provides that "all such projects shall be open to public use generally" for various "recreational purposes, . . . when such use is determined by the Secretary of the Army not to be contrary to the public interest, all under such rules and regulations as the Secretary of the Army may deem necessary."   *Id.   See also South Dakota v. Bourland*, 508 U.S. 679, 690 (1993) (quoting 16 U.S.C. § 460d) (noting that the Act

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 1**

"clearly prohibits any 'use' of the lands . . . which is determined by the Secretary of the Army to be 'contrary to the public interest.'").

Federal regulations govern the public use of water resource development projects that are administered by the Corps.   *See* 36 C.F.R. Pt. 327.   Upon the creation of a flood control project, "[i]t is the policy of the Secretary of the Army, acting through the Chief of Engineers, to manage the natural, cultural and developed resources of each project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources."   36 C.F.R. § 327.1(a).

To provide for "more effective recreation-resource management of lake and reservoir projects," the Corps issued regulations in 1973, as authorized by the Act.   Rules and Regulations Governing Public Use of Water Resources Development Projects Administered by the Chief of Engineers, 38 Fed. Reg. 7,552, 7,552 (March 23, 1973).   As amended,[1] the regulation entitled "Explosives, firearms, other weapons and fireworks" provides:

> (a) The possession of loaded firearms, ammunition, loaded projectile firing devices, bows and arrows, crossbows, or other weapons is prohibited unless:
> > (1) In the possession of a Federal, state or local law enforcement officer;
> > (2) Being used for hunting or fishing as permitted under § 327.8, with devices being   unloaded when transported to, from or between hunting and fishing sites;
> > (3) Being used at authorized shooting ranges; or
> > (4) Written permission has been received from the District Commander.
>
> (b) Possession of explosives or explosive devices of any kind, including fireworks or other pyrotechnics, is prohibited unless written permission has been received from the District Commander.

36 C.F.R. § 327.13.

**ARGUMENT -** "A preliminary injunction is an extraordinary remedy never awarded as of right."

---

1 The regulation was last amended in 2000.   *See* Public Use of Water Resources Development Projects Administered by the Chief of Engineers, 65 Fed. Reg. 6898, 6901 (Feb. 11, 2000).

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 2**

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).   "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."   *Id.* at 20 (citations omitted).   A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" on all four elements. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (emphasis in original) (citation and internal punctuation omitted).   "[T]he purpose of a preliminary injunction is to preserve the status quo between the parties pending a resolution of a case on the merits."   *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (citation omitted).   The status quo is defined as "the last uncontested status which *preceded* the pending controversy."   *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citations and internal punctuation omitted).

Plaintiffs are not seeking to preserve the status quo, however.   Instead, they are after a mandatory injunction that would alter it dramatically by ordering the Corps to cease enforcing its decades-old rule regarding the carrying of weapons on public lands that the Corps manages.[2]   At

---

2  Although Plaintiffs' Complaint appears to be challenging the Corps regulation as applied to Plaintiffs Baker and Morris, the prayer for relief seeks to "[p]ermanently enjoin Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them from enforcing 36 C.F.R. § 327.13."   Compl. at Prayer for Relief ¶ C.   Such a remedy would only be proper if Plaintiffs were challenging the Corps regulation as unconstitutional on its face. However, any such claim is time-barred because the regulation was promulgated in 1973, and was last amended in 2000.   *See Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 904 (9th Cir. 2012) ("Although Plaintiffs cannot challenge facially the [agency's] 1983 regulatory definition, they can challenge the [agency's] alleged application of that definition in the 2008 [agency] regulations as exceeding the agency's statutory authority.); *Wind River Mining Corp. v. United States*, 946 F.2d 710, 715 (9th Cir.1991) (a plaintiff may contest "an agency decision as exceeding

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 3**

present, and since at least 2000, the Corps does not allow the carrying of such weapons; thus, Plaintiffs seek a mandatory injunction.  *See Arizona Dream Act Coalition v. Brewer*, __ F.Supp.2d __, 2013 WL 2128315, at *3 (D. Ariz. May 16, 2013) (plaintiffs seeking to prohibit defendants from applying an allegedly unconstitutional policy sought a mandatory, not prohibitory, injunction).   Because mandatory injunctions do not just preserve the status quo, they are "particularly disfavored" in this Circuit.  *Working Washington v. Cent. Puget Sound Regional Transit Auth.*, __ Fed. App'x __, 2013 WL 3487561, at *1 (9th Cir. July 12, 2013) (quoting *Marlyn Nutraceuticals*, 571 F.3d at 879).   "Thus, 'mandatory preliminary relief is subject to heightened scrutiny and should not be issued unless the facts and law *clearly favor* the moving party.'"  *Id.* (quoting *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993)) (emphasis in original).   When a party seeks mandatory preliminary relief that "goes well beyond maintaining the status quo pendente lite, courts should be extremely cautious about issuing a preliminary injunction."  *Martin v. Int'l Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984).   As we now explain, Plaintiffs have not come close to showing that they are entitled to mandatory preliminary relief.

## I.      Plaintiffs Have Failed To Allege Imminent Irreparable Injury.

Under *Winter*, Plaintiffs "must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).   The Ninth Circuit has also indicated that the injury must be imminent.  *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674–75 (9th Cir.1988) (citation omitted).

---

constitutional or statutory authority . . . later than six years following the decision by filing a complaint for review of the adverse application of the decision to the particular challenger").

**A.  Plaintiffs' Unexplained Delay in Seeking Relief Undercuts Any Claim That They Will Suffer Irreparable Injury if Preliminary Injunctive Relief Is Not Granted.**

Plaintiffs' delay in seeking mandatory preliminary injunctive relief undermines their claim of irreparable injury.   "[I]rreparable harm has been described as '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction.'"  *Native Ecosystems Council v. U.S. Forest Servs.*, 2011 WL 4015662, at *7 (D. Idaho Sept. 9, 2011) (quoting 11A Wright & Miller, Fed. Prac. & Proc. § 2948).   Thus, "[w]here a plaintiff fails to demonstrate a likelihood of irreparable harm in the absence of preliminary relief, the court need not address the remaining elements of the preliminary injunction standard."  *Id.* (citing *Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011)).   Any delay by a plaintiff in seeking preliminary relief is a relevant factor when considering whether the plaintiff has met its burden to show irreparable harm. "[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation marks and citation omitted).

This Circuit has made clear that a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."  *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374 1377 (9th Cir. 1985); *see also Lydo Enters. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief."); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F.Supp.2d 1070, 1090 (C.D.Cal.1999) ("[Plaintiff]'s [five-month] delay in seeking injunctive relief further demonstrates the lack of any irreparable harm."), *aff'd*, 202 F.3d 278 (9th Cir. 1999); *Valeo Intellectual Prop., Inc. v. Data Dep't Corp.*, 368 F.Supp.2d 1121, 1128 (W.D.

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 5**

Wash.2005) ("A three-month delay in seeking injunctive relief is inconsistent with [plaintiff]'s insistence that it faces irreparable harm."); *Lisa Frank, Inc. v. Impact Int'l.*, 799 F. Supp. 980, 1001 (D. Ariz. 1992) (delay of several months excusable only where during that time there were: "1) approximately 358 requests for production of documents; 2) approximately 95 additional requests for production of documents; 3) approximately 46 interrogatories; 4) approximately 31 requests for admissions; 5) depositions of nine LFI and Stuart Hall employees in Arizona and Kansas City").

Here, Plaintiffs' claim of imminent irreparable injury is undermined by their substantial (and unexplained) delay before seeking the relief that is the subject of the present motion.   Plaintiff Morris states that she "regularly recreate[s] on land and waters administered by [the Corps] during the summer" and that in the summers of 2012 and 2013, she has "used Corps-administered public lands approximately 1-2 times a week."   *See* Declaration of Elizabeth E. Morris ("Morris Decl.") ¶¶ 6, 12-13 [ECF No. 10].   Similarly, Plaintiff Baker "regularly camp[s] and hunt[s] in Idaho," and first secured a reservation to camp in Corps-administered public lands in March 2013.   *See* Declaration of Alan C. Baker ("Baker Decl.") ¶¶ 6, 8 [ECF No. 9].   Despite all of this regular use, it was not until August 5, 2013 that Plaintiffs sought a mandatory preliminary injunction directing the U.S. Army Corps of Engineers to cease enforcement of its decades-old regulation against Plaintiffs.   "Plaintiffs' delay. . . undermines plaintiffs' assertion of immediate, irreparable harm because plaintiffs are seeking a *change* in the status quo. . ."   *ACLU v. City of Las Vegas*, 13 F. Supp. 2d 1064, 1083 (D. Nev. 1998) (emphasis in original).

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 6**

The critical importance of irreparable injury derives from the fact that "[p]reliminary injunctions are issued to forestall imminent and irreversible injury to the plaintiff's rights." *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 980 (S.D.N.Y. 1989). Consequently, "[d]elay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action."  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten-week delay from notice); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("Courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.")   Where the delay is significant, it "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  *Citibank*, 756 F.2d at 277 (citation omitted).   The fact that Plaintiffs waited so long to seek mandatory preliminary injunctive relief is strong evidence that they will not suffer imminent irreparable harm if their motion is denied.   Plaintiffs have thus failed to satisfy their burden on the first requirement of preliminary relief.

## B.  Even Absent Delay, Plaintiffs Have Failed to Demonstrate the Likelihood of Irreparable Injury.

Moreover, Plaintiffs' claim of irreparable harm is founded on case law that is either outdated or distinguishable from the factual situation here.   Contrary to Plaintiffs' contention, merely alleging constitutional injury is not enough to demonstrate the likelihood of irreparable harm.   As another court in this Circuit explained when confronted with the assertion that pleading an equal protection claim, by itself, establishes irreparable injury: "Plaintiffs argue that being subjected to unconstitutional state action constitutes irreparable injury, but this is too broad a statement.   To be sure, some constitutional violations virtually always cause irreparable harm. The Supreme Court has held, for example, that the loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury.   But Plaintiffs have not provided legal support for the proposition that all equal protection violations cause irreparable harm."   *Arizona Dream Act Coalition v. Brewer*, __   F. Supp. 2d __, 2013 WL 2128315, at *21 (internal citation and punctuation omitted).   Courts in this Circuit and other courts have recognized that there is no per se rule that in alleging a constitutional injury a plaintiff automatically demonstrates irreparable harm.   *See Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."); *Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000) ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm.   Our case law has not gone that far, however.   The only areas of constitutional jurisprudence where we have said that an on-going violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether.    This is plainly not such a case.") (internal citations omitted).

Plaintiffs' reliance on *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), to support a finding of irreparable harm here is similarly misplaced.   First, the analysis of irreparable harm in *Ezell* turned in part on the fact that the plaintiffs had asserted a facial constitutional challenge, in which "individual application facts do not matter."   *Id.* at 697.   Second, Plaintiffs' circumstances are readily distinguishable from those of the individual plaintiffs in *Ezell*.   In that case, as the Seventh Circuit explained, the challenged municipal ordinance "impermissibly burdens the core Second Amendment right to possess firearms *in the home* for self-defense because it prohibits, everywhere in the city, the means of satisfying a condition the City imposes for lawful firearm possession."   *Id.* at 698 (emphasis added).   That is not the situation here, where the regulation at

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 8**

issue does not burden in any way the core Second Amendment right to possess firearms in the home, where constitutional protection is at its zenith.   *See Dist. of Columbia v. Heller*, 554 U.S. 570, 635 (2008) ("[W]hatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.").   *Ezell* does not stand for the proposition that merely by asserting a Second Amendment claim, a plaintiff establishes irreparable harm.   To the extent that Plaintiffs seek to conflate the *substantive* protections of the First Amendment with those of the Second, it bears noting that courts of appeal have been justly "hesitant to import <u>substantive</u> First Amendment principles wholesale into Second Amendment jurisprudence."   *See Kachalsky v. County of Westchester*, 701 F.3d 81, 91-92 (2d Cir. 2012).   *See also*, *Hightower v. City of Boston*, 693 F.3d 61, 80 (1st Cir. 2012) (declining to apply First Amendment prior restraint and overbreadth doctrines to a Second Amendment claim); *United States v. Marzzarella*, 614 F.3d 85, 97 n.15 (3d Cir. 2010) ("While we recognize the First Amendment is a useful tool in interpreting the Second Amendment, we are also cognizant that the precise standards of scrutiny and how they apply may differ under the Second Amendment.").

Moreover, Plaintiffs have misplaced their reliance on cases such as *Sammartano v. First Judicial Court*, 303 F.3d 959 (9th Cir. 2002), and *Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005), which they cite for the proposition that a party seeking preliminary injunctive relief in the First Amendment context can establish irreparable harm merely by "demonstrating the existence of a colorable First Amendment claim."   Brief in Support of Pl. Mot. (ECF No. 4-1) at 18.   As another court in this Circuit has recognized, "[t]his standard is no longer viable" because the analysis in *Sammartano* and similar cases was based on the balancing test for preliminary injunction formulated by the Ninth Circuit prior to the Supreme Court's decision in *Winter*.

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 9**

Specifically, the *Sammartano* court states that "even if the merits of the constitutional claim were not 'clearly established'. . . the fact that a case raises serious First Amendment questions compels a finding that there exists the *potential* for irreparable injury."     The finding of the mere potential of irreparable injury is no longer sufficient to support entry of a preliminary injunction after *Winter*. *Dex Media West, Inc. v. City of Seattle*, 790 F. Supp. 2d 1276, 1289 n.8 (W.D. Wash. 2011) (emphasis in original) (quoting *Sammartano*, 303 F.3d at 973); *see also Cottrell*, 632 F.3d at 1135 ("To the extent prior cases applying the 'serious questions' test have held that a preliminary injunction may issue where the plaintiff shows only that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor, without satisfying the other two prongs, they are superseded by *Winter*, which requires the plaintiff to make a showing on all four prongs."); *Sanchez v. City of Los Angeles*, 2011 WL 6951822, at *9 (C.D. Cal. Oct. 31, 2011) (recognizing abrogation of *Sammartano* in *Dex Media West*).

Thus, Plaintiffs have not demonstrated a constitutional injury.   Simply citing the Second Amendment in their Complaint does not automatically confer "irreparable harm" on Plaintiffs.   In addition, under existing caselaw for the award of a preliminary injunction, the potential for such harm is insufficient for the Court to provide interim relief.   In sum, Plaintiffs have failed to demonstrate the likelihood of imminent irreparable harm.

## II.    Plaintiffs Have Failed to Demonstrate That Existing Law "Clearly Favor[s]" Their Eventual Success on the Merits.

In order to be granted a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits of a claim that would entitle it to the equitable remedy sought.   *Winter*, 555 U.S. at 20.   Plaintiffs err in their contention that the more lenient standard from *National Wildlife Federation v. National Marine Fisheries Service*, 422 F.3d 782 (9th Cir. 2005), applies here.   Pl.

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 10**

Mot. at 6.   Plaintiffs fail to explain that the "line of cases" that this Court recently stated was "still good law" was the "line of Circuit authority – predating *Winter* – holding that the preliminary injunction analysis does not apply to injunctions issued pursuant to the [Endangered Species Act]." *Western Watersheds Project v. U.S. Fish & Wildlife Serv.*, 2013 WL 3270363, at *4 (D. Idaho June 26, 2013).   Because Plaintiffs do not assert a claim under the Endangered Species Act, this more lenient standard does not apply.   Additionally, as explained above, "mandatory preliminary relief is subject to heightened scrutiny and should not be issued unless the facts and law *clearly favor* the moving party."   *Working Washington*, __ Fed. App'x __, 2013 WL 3487561, at *1 (emphasis in original).   Plaintiffs have failed to satisfy this burden.

### A. Plaintiffs Fail to Identify Any Case Law Finding that a Law Restricting the Possession of a Firearm in a Tent on Public Land Violates the Second Amendment.

"[T]he Second Amendment does not guarantee the right to possess for *every purpose*, to possess *every type of weapon*, to possess at *every place*, or to possess by *every person*."   *United States v. Carpio-Leon*, 701 F.3d 974, 977 (4th Cir. 2012) (emphasis in original).   Nevertheless, Plaintiffs contend that they are likely to succeed on their first claim, that it is unconstitutional for the Army Corps of Engineers to prohibit the possession of firearms by occupants of tents on public lands that the Corps manages and administers.   *See Compl.* ¶¶ 47-50.   But Plaintiffs do not identify any case that has so held.   Instead, Plaintiffs advance two different arguments: (1) the regulation here directly conflicts with the Supreme Court's central holding in *Heller*, and (2) analogies to Fourth Amendment case law show that the regulation is inconsistent with the Second Amendment.   Pl. Mot. at 6-9.   Neither argument has merit.

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 11**

1.  ***Heller*** **Did Not Involve the Possession of a Firearm in a Temporary Dwelling.**

First, Plaintiffs are mistaken in their contention that *Heller* stands for the proposition that any law restricting the possession of a firearm in a temporary dwelling violates the Second Amendment.   Pl. Mot. at 6-7.   The first sentence of *Heller* makes clear the scope of the Supreme Court's holding: "We consider whether a District of Columbia prohibition on the possession of usable handguns in *the home* violates the Second Amendment to the Constitution."   554 U.S. at 573 (emphasis added).   The respondent in *Heller* did not purport to be seeking the right to possess a firearm in any temporary dwelling, but simply "the right to render a firearm operable and carry it about his home in that condition only when necessary for self-defense."   *Id.* at 576.   And contrary to Plaintiffs' contention, *Heller*'s "central holding" does not concern the constitutionality of possessing a firearm "in a dwelling."   Pl. Mot. at 6.   In fact, *Heller* never used the term "dwelling," save for a single passing reference to a colonial law discussed by the dissenters that forbade city residents to take loaded firearms into "any Dwelling House, Stable, Barn, Out-house, Ware-house, Store, Shop or other Building."   554 U.S. at 631.   Rather, the central holding of *Heller* was that the Second Amendment prohibited a complete ban on the possession of functional handguns in "the home," not "a dwelling," much less a temporary dwelling on public land.   *See id.* at 635 ("And whatever else it leaves to future evaluation, [the Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of *hearth and home*."); *id.* ("In sum, we hold that the District's ban on handgun possession in *the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm in *the home* operable for the purpose of immediate self-defense.") (emphasis added).   The constitutional status of firearms possessed in a tent on public land was simply not before the Court

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 12**

in *Heller*.   Plaintiffs are thus incorrect that the regulation   at issue here "directly conflicts with the central holding of *Heller*," Pl. Mot. at 7.   Their mistaken reliance on *Heller* does not show that the law and facts clearly favor their success on the merits of their first claim.

### 2. Fourth Amendment Cases on the Searches of Tents Are Inapplicable and Fail to Show the Application of the Second Amendment to Plaintiffs' Claims.

Second, Plaintiffs' attempt to analogize the present case to case law discussing whether occupants of a tent had a reasonable expectation of privacy under the Fourth Amendment is problematic at best.   Pl. Mot. at 7-9.   First, Plaintiffs largely overstate the holdings from the Fourth Amendment case law they cite.   It is true that some criminal cases from the Ninth Circuit have determined that criminal defendants can have a reasonable expectation of privacy in a tent in which they were dwelling temporarily.[3]   But most of these cases stand for the more limited principle that a person *can* have a reasonable expectation of privacy in a tent, such that the Fourth Amendment applies.[4]   They do not stand for the broader proposition that the Fourth Amendment

---

3  *See United States v. Basher*, 629 F.3d 1161, 1167-68 (9th Cir. 2011) ("We have held that people *can* have a reasonable expectation of privacy in a tent pitched on public land.")   (citing *United States v. Gooch*, 6 F.3d 673, 677 (9th Cir. 1993) (emphasis added)); *United States v. Sandoval*, 200 F.3d 659, 660-61 (9th Cir. 1999) (determining, based on the specific circumstances presented, that the criminal defendant had a subjective expectation of privacy and that that expectation was reasonable).

4  The exception is *Eng Fung Jem v. United States*, 281 F.2d 803 (9th Cir. 1960), which purports to apply a per se rule that the Fourth Amendment should apply with equal vigor to hotel guests and to occupants of permanent dwellings.   Such a per se rule cannot withstand the Supreme Court's landmark ruling in *Katz v. United States*, 389 U.S. 347 (1967).   *Katz* established the principle that to determine whether a warrantless search or seizure violates the Fourth Amendment depends on whether a person has exhibited a subjective expectation of privacy in the object of the search or seizure, and whether society is prepared to recognize that expectation as reasonable.   *Id.* at 360-61 (Harlan, J., concurring); *see*, *e.g.*, *Sandoval*, 200 F.3d at 660 ("Only if both the subjective and objective tests are met can we find that a Fourth Amendment interest has been violated.")

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 13**

requires that a tent must be treated exactly the same way as a home, but only that a reasonable expectation of privacy was present under the specific circumstances presented.[5]

Thus, for example, it is well established that "the presumptive protection accorded people at home [under the Fourth Amendment] extends to outdoor areas traditionally known as 'curtilage' – areas that, like the inside of a house, harbor the intimate activity associated with the sanctity of a person's home and the privacies of life." *Sims v. Stanton*, 706 F.3d 954, 959 (9th Cir. 2013) (citation and internal punctuation omitted). But the Ninth Circuit has recognized that it would be "very problematic" to apply this same protection to the area outside of a tent, as opposed to a home. *See United States v. Basher*, 629 F.3d 1161, 1169 (9th Cir. 2011). And under different circumstances, courts have found that occupants of a tent did not have a reasonable expectation of privacy. *See Haley v. State*, 696 N.E.2d 98, 101-02 (Ind. Ct. App. 1998) (occupants of tent in public campground had no reasonable expectation of privacy because the tent's screens allowed outsiders to see clearly into the tent and observe its occupants).

The larger point is that "[a]ny determination of an individual's expectation of privacy [under the Fourth Amendment] is necessarily fact-intensive." *United States v. Castellanos*, 716 F.3d 828, 846 (4th Cir. 2013) (quoting *United States v. Smith*, 978 F.2d 171, 180 (5th Cir. 1992)). The Supreme Court "has not developed a routinized checklist that is capable of being applied across the board, and each case therefore must be judged according to its own scenario."

---

5 The same is true of the state court cases cited by Plaintiffs. *See State v. Pruss*, 181 P.3d 1221, 1234 (Idaho 2008) ("[O]ne *can* certainly infer that a person has a subjective expectation of privacy in his dwelling, even if it is a temporary structure like a tent, travel trailer, or the hooch in this case.") (emphasis added); *Alward v. State*, 912 P.2d 243, 249 (Nev. 1996) (determining, based on specific circumstances presented, that defendant had reasonable expectation of privacy in his tent), *overruled on other grounds*, 111 P.3d 690 (Nev. 2005); *Float-Rite Park v. Village of Somerset*, 629 N.W. 2d 818, 824 (Wis. Ct. App. 2001) ("Float-Rite and its patrons, therefore, may in some circumstances have a protected interest in privacy in some areas of the premises.").

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 14**

*Vega-Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 178 (1st Cir. 1997).   Thus, even if the

analogy between Second and Fourth Amendment case law were persuasive, it does not follow,

based on the specific circumstances at issue in the cases cited by Plaintiffs, that existing law clearly

favors Plaintiffs' likelihood of success on the merits.

In any event, the analogy between Second and Fourth Amendment case law is flawed

because Plaintiffs cite no support for the proposition that the scope of these Amendments is

co-extensive.   Different constitutional provisions do not necessarily have the same scope or

substantive protections; *see supra* at 9.[6]   And trying to graft substantive Fourth Amendment

doctrines onto Second Amendment cases may be problematic given that, as one Court of Appeals

recently observed, "as we move outside the home, firearm rights have always been more limited,

because public safety interests often outweigh individual interests in self-defense."   *United*

*States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 756 (2011); *see*

*also Heller*, 554 U.S. 626-627 (noting with approval "laws forbidding the carrying of firearms in

sensitive places such as schools and government buildings.").   Finally, a finding that Fourth

Amendment privacy interests apply to a particular place does not end the inquiry as to whether the

search or seizure at issue was unconstitutional.   *See, e.g., United States v. Rigsby*, 943 F.2d 631,

---

6 *See also*, *e.g.*, *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (per curiam) ("The extent to which
the First and Sixth Amendment public trial rights are coextensive is an open question, and it is not
necessary here to speculate whether or in what circumstances the reach or protections of one might
be greater than the other."); *Pension Ben. Guar. Corp. v. R. A. Gray & Co.*, 467 U.S. 717, 733
(1984) ("We have never held, however, that the principles embodied in the Fifth Amendment's
Due Process Clause are coextensive with prohibitions existing against state impairments of
pre-existing contracts."); *United States v. Street*, 472 F.3d 1298, 1309-10 (11th Cir. 2006) ("[A]
seizure [under the Fourth Amendment] does not necessarily constitute custody for *Miranda*
purposes.") (citing cases); *Clajon Prod. Corp. v. Petera*, 854 F. Supp. 843, 860 (D. Wyo. 1994)
("While there is clearly some overlap between the Privileges and Immunities Clause and
the negative commerce clause, they are distinct constitutional provisions, the reaches of which are not
co-extensive."), *aff'd on other grounds*, 70 F.3d 1566 (10th Cir. 1995).

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 15**

637 (6th Cir. 1991) (cursory search of defendant's tent and seizure of shotgun found therein were "valid based on the government's legitimate interests as weighed against any privacy expectation which defendant may have had in the tent").   Thus, even if Plaintiffs' analogy between the two different constitutional provisions were persuasive, Plaintiffs still have not clearly shown that they are likely to succeed on the merits of their first claim.

       **B.  Plaintiffs Have Not Shown That the Facts and Law Clearly Favor Success on Their Second Claim Because They Fail to Identify Any Case Law Clearly Demonstrating That a Law Restricting the Carrying of Firearms on Federally-Owned Public Land Violates the Second Amendment.**

       Because Plaintiffs seek mandatory injunctive relief, they must show that the facts and law clearly favor their success on the merits.   Plaintiffs have failed to make such a showing with respect to their second claim, namely, that the Second Amendment prohibits the Army Corps of Engineers from restricting the carrying of firearms on public lands that the Corps administers.

       The primary difficulty with Plaintiffs' arguments supporting this claim is their failure to acknowledge that this case involves the regulation of land owned by the federal government.   "It is a long-settled principle that governmental actions are subject to a lower level of [constitutional] scrutiny when the governmental function operating is not the power to regulate or license, as lawmaker, but, rather, as proprietor, to manage its internal operations."   *United States v. Kokinda*, 497 U.S. 720, 725 (1990) (plurality opinion) (citation omitted); *see also Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 598 (2008) (observing, in the context of equal protection claim against government employer, that "there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation")   (internal punctuation omitted).   In upholding a county ordinance regulating the sale of firearms "only on County

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 16**

property" against a Second Amendment challenge, the Ninth Circuit pointedly cited <u>Kokinda</u> and

*Engquist* for their respective statements about the different level of constitutional scrutiny afforded

to the government when acting as proprietor.   *See Nordyke v. King*, 681 F.3d 1041, 1044-45 (9th

Cir. 2012).   The Ninth Circuit thus considers firearms regulations to be subject to a lower standard

of constitutional scrutiny when the government is regulating conduct on property it owns.

 The Corps promulgated the regulation here under its constitutional and statutory authority

to issue "such rules and regulations as the Secretary of the Army may deem necessary" to

administer the public use of park and recreational facilities at water resource development projects

under the Army's control.   16 U.S.C. § 460d.   This authority includes the ability to "prohibit[]

any 'use' of the lands . . .   which is determined by the Secretary of the Army to be 'contrary to the

public interest."   *Bourland*, 508 U.S. at 690.   "Beyond doubt, the Property Clause authorizes the

enactment and enforcement of regulations which . . . are designed to maintain safety and order on

government property."   *United States v. Gliatta*, 580 F.2d 156, 160 (5th Cir. 1978).   The Corps

regulation is particularly reasonable in light of the fact that in managing public land, the United

States "exercises the powers both of a proprietor and of a legislature."   *Kleppe v. New Mexico*,

426 U.S. 529, 540 (1976) (citations omitted); *see also United States v. Gardner*, 107 F.3d 1314,

1318 (9th Cir. 1997) ("The Supreme Court has consistently recognized the expansiveness of [the

Property Clause] power, stating that '[t]he power over the public land thus entrusted to Congress is

without limitations.'") (quoting *Kleppe*, 426 U.S. at 539) (citing cases); *Light v. United States*,

220 U.S. 523, 536 (1911) ("The United States can prohibit absolutely or fix the terms on which its

property may be used. . . . These are rights incident to proprietorship, to say nothing of the power

of the United States as a sovereign over the property belonging to it.").   Plaintiffs' failure to

recognize how this case thus differs significantly from the cases they cite leads Plaintiffs to several logical errors.

First, Plaintiffs' reliance on *Heller* fails.   As explained above, *see supra* II.A, that case's central holding is that the Second Amendment prohibits a total ban on the possession of functional handguns in the home.   *Heller* did not disapprove of restrictions on the carrying of a firearm on land owned by another party (here, by the United States).   Nor did *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).   Thus, Plaintiffs' reliance on *Heller* and *McDonald* is misplaced.

Second, none of Plaintiffs' cited state court cases concern restrictions on carrying firearms on publicly-owned land.   Plaintiffs quote out-of-context Pl. Mot. at 11 three nineteenth-century state decisions that *Heller* referenced to show the unusually severe restriction of the District of Columbia's total ban on handgun possession, not to either adopt or reject the holdings of those nineteenth-century cases as a matter of federal constitutional law.   554 U.S. at 629.   In any event, none of the cited cases involve a restriction on carrying firearms on land publicly owned and managed by the federal government.[7]   Plaintiffs' reliance on this case law is thus misplaced.[8]

---

7 *See Nunn v. State*, 1 Ga. 243, 1846 WL 1167, at *11 (Ga. 1846) (upholding, under Georgia constitution, a law prohibiting carrying concealed weapons within the State of Georgia, but striking down prohibiting the open carry of weapons); *Andrews v. State*, 50 Tenn. 165, 1871 WL 3579, at *11 (Tenn. 1871) (striking down, under Tennessee constitution, law prohibiting the carrying of a pistol "publicly or privately, without regard to time or place, or circumstances" within the State of Tennessee); *State v. Reid*, 1 Ala. 612, 1840 WL 229, at *6-7 (Ala. 1840) (upholding law, under state constitution, prohibiting concealed carrying of deadly weapons within the State of Alabama).

8 The same is true of Plaintiffs' reliance on various twentieth-century state cases, none of which involve laws regulating the carrying of firearms on publicly-owned land.   *See Kellogg v. City of Gary*, 562 N.E.2d 685, 688-90 (Ind. 1990) (state policy denying citizens handgun application forms*); State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139, 141 (W. Va. 1988) (state law prohibiting carrying of deadly weapon without a license); *City of Lakewood v. Pillow*, 501 P.2d 744, 745 (Colo. 1972) (city ordinance prohibiting possession of deadly weapon); *City of Las Vegas v. Moberg*, 485 P.2d 737, 738 (N.M. App.   1971) (city ordinance prohibiting possession of deadly

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 18**

Third, William Blackstone's *Commentaries on the Laws of England* does not advance

Plaintiffs' arguments.    Plaintiffs cite two provisions that, they claim, represent the only type of

"reasonable regulation [of firearms] that the Second Amendment tolerates" – a law prohibiting

English subjects from "appear[ing] armed in any open place by day, or night, with faces blacked or

otherwise disguised," and a law prohibiting "riding or going armed with dangerous or unusual

weapons."    Pl. Mot. at 12, 13 (quoting William Blackstone, 4 *Commentaries on the Laws of

England* *143-44, 148 (1753)).    But Blackstone neither argues that these particular regulations

represent the only types of firearms regulation permitted under the English Constitution, nor that

their scope represents the outer boundary of permissible regulation.    Furthermore, contrary to

Plaintiffs' suggestion, contemporary firearms regulation need not be tied to "some form of mal

intent [sic] or bad action" to be constitutional.    Pl. Mot. at 13.    *See United States v. Skoien*,

614 F.3d 638, 640 (7th Cir. 2010) (en banc) ("That *some* categorical limits are proper is part of the

original meaning, leaving to the people's elected representatives the filling in of details.").

Moreover, as Plaintiffs tacitly acknowledge, contemporary legal opinion differs on whether the

Statute of Northampton – the English law prohibiting "riding or going armed with dangerous or

unusual weapons" – only applied to engaging in armed terror, or extended more broadly.    *See*

Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths

from Historical Realities*, 39 Fordham Urban L.J. 1695, 1712-13 (2012) (noting that "[m]odern

scholars are divided over how to interpret the application of this statute in early American law,"

with some contending that it "prohibited armed travel" and others "reject[ing] this view").    In any

---

weapon); *People v. Nakamura*, 62 P.2d 246, 246 (Colo. 1936) (city ordinance prohibiting
non-naturalized aliens from possessing firearms); *People v. Zerillo*, 189 N.W. 927, 928 (Mich.
1922) (state law restricting non-naturalized aliens from possessing firearms without special permit
from sheriff); *In re Brickey*, 70 P. 609, 609 (Idaho 1902) (state law prohibiting carrying deadly
weapons within any city, town, or village).

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION - 19**

event, neither of the laws discussed in Blackstone relate to the carrying of weapons on government-owned lands.   Thus, Plaintiffs' reliance on Blackstone is misplaced.

Fourth, Plaintiffs' discussion of several decisions involving Second Amendment challenges to laws governing conduct outside the home does not indicate that Plaintiffs are clearly likely to succeed here.   Pl. Mot. at 14-15.   For one thing, Plaintiffs fail to acknowledge that many of these decisions *upheld* the laws in question.[9]   As in *Peruta v. City of San Diego*, 758 F. Supp. 2d 1106 (S.D. Cal. 2010), *appeal pending*, courts in this Circuit have repeatedly upheld Second Amendment challenges to laws governing the carrying of firearms in public places.[10]   Nor are this Circuit's decisions the only cases that have upheld laws governing conduct outside the home against Second Amendment challenges.[11]

---

9 *See Kachalsky v. County of Westchester*, 701 F.3d 81, 88-100 (2d Cir. 2012) (rejecting Second Amendment challenge to law requiring showing of good cause to obtain license to carry a concealed weapon in public), *cert. denied*, 133 S. Ct. 1806 (2013); *Peruta v. City of San Diego*, 758 F. Supp. 2d 1106, 1111-17 (S.D. Cal. 2010) (same), *appeal pending*; *GeorgiaCarry.Org, Inc. v. State of Georgia*, 764 F. Supp. 2d 1306, 1312-20 (M.D. Ga. 2011) (upholding law prohibiting the carrying of firearms in a place of worship against Second Amendment challenge), *aff'd*, 687 F.3d 1244 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 856 (2013).

10 *See Nordyke v. King*, 681 F.3d 1041, 1043-45 (9th Cir. 2012) (rejecting Second Amendment challenge to ordinance prohibiting possession of firearms on county property if not being offered for sale during a gun show, and not secured to prevent unauthorized use); *Nichols v. Brown*, 2013 WL 3368922, at *3-6 (C.D. Cal. July 3, 2013) (plaintiff was unlikely to succeed on the merits of his claim that state law prohibiting open carrying of firearm in public violated the Second Amendment); *Young v. State of Hawaii*, 911 F. Supp. 2d 972, 988-91 (D. Haw. 2012) (rejecting Second Amendment challenge to state licensing scheme for carrying of firearms), *appeal docketed*; *Richards v. County of Yolo*, 821 F. Supp. 2d 1169, 1173-77 (E.D. Cal. 2011) (rejecting Second Amendment challenge to county's concealed weapons licensing policy requiring showing of good cause and good moral character), *appeal docketed*; *Hall v. Garcia*, 2011 WL 995933, at *2-5 (N.D. Cal. March 17, 2011) (upholding law prohibiting gun possession within 1000 feet of a school against Second Amendment challenge).

11 *See, e.g.*, *Drake v. Filko*, __ F.3d __, 2013 WL 3927735, at *3-10 (3d Cir. July 31, 2013) (rejecting challenge to state law requiring showing of justifiable need to receive permit to carry handgun in public); *Woollard v. Gallagher*, 712 F.3d 865, 874-83 (4th Cir. 2013) (reversing ruling

Furthermore, the three cases cited by Plaintiffs in which courts have struck down such laws are easily distinguishable from the present case.   The state law at issue in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), prohibited every Illinois resident (with limited exceptions) from carrying a loaded and immediately-accessible firearm anywhere in the State of Illinois except for their permanent residences, fixed places of business, or on the property of someone who consented to the carrying of firearms.   *See id.* at 934.   And the Seventh Circuit expressly noted that in contrast to Illinois' law – the only one of its kind in all fifty States – "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need."   *Id.* at 940; *see also Nichols v. Brown*, 2013 WL 3368922, at *4 n.7 (C.D. Cal. July 3, 2013) (distinguishing *Moore* as "inapposite" because "the law at issue there was far more burdensome than" a state law prohibiting open carrying of firearms in public).   In *Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012), North Carolina had prohibited any person from possessing any firearm anywhere in the state (except the home) when a state of emergency had been declared.   Thus, whatever dicta these cases might contain about the scope of the Second Amendment, their actual holdings are considerably narrower.   Finally, *Bonidy v. U.S. Postal Service*, 2013 WL 3448130 (D. Colo. July 9, 2013) – an unpublished district court decision outside this Circuit – did not find that the plaintiff possessed an unlimited right to carry firearms in public or on government-owned property, but only to secure his firearm in his vehicle while

---

that Second Amendment prohibited state's conditioning eligibility for permit to carry, wear, or transport a handgun in public on showing of "good and substantial reason"), *pet. for cert. pending*; *Peterson v. Martinez*, 707 F.3d 1197, 1209-12 (10th Cir. 2013) (upholding state law conditioning issuance of concealed weapons permit on state residency); *Masciandaro*, 638 F.3d at 469-74 (rejecting Second Amendment challenge to federal regulation prohibiting carrying or possessing a loaded weapon in a motor vehicle within national park areas).

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 21**

parked at a specific post office.   And even the court in that case limited the scope of its relief to the

individual plaintiff and specific location at issue.   *See id.* at *6-7 (ordering the Postal Service to

"take such action as is necessary to permit Tab Bonidy to use the public parking lot adjacent to the

Avon[, Colorado] Post Office Building with a firearm authorized by his Concealed Carry Permit

secured in his car in a reasonably prescribed manner" and denying all other claims that the

regulation was unconstitutional).

        The larger point is that Plaintiffs repeatedly emphasize a broad "right to carry firearms for

self-defense," while declining to acknowledge the inherent limits on that right recognized by the

Supreme Court, by courts in this Circuit, and by many other courts.   In seeking a mandatory

preliminary injunction, Plaintiffs ask this Court to rule that the law and facts "clearly favor" their

success on the merits, but their second claim is premised on an interpretation of the Second

Amendment that is far broader in scope than the one recognized in *Heller*'s holding.   *Compare*

*Heller*, 554 U.S. at 635 ("[W]e hold that the District's ban on handgun possession in the home

violates the Second Amendment, as does its prohibition against rendering any firearm in the home

operable for the purpose of immediate self-defense.") *with* Pl. Mot. at 15 ("[I]t is clear from *Heller*

and the cases applying it that the Second Amendment explicitly guarantees the right to carry

firearms for self-defense.").   Courts in this Circuit have not applied the right recognized in *Heller*

so broadly.[12]   In sum, the cases Plaintiffs cite involving Second Amendment challenges to laws

---

12 *See Hall*, 2011 WL 995933 at *3 ("[U]nder *Heller* the right to bear arms in public is not
unqualified."); *id.*   ("[T]he law [at issue] has no impact on [plaintiff's] right to possess a handgun
at home or on any other private property."); *Nichols*, 2013 WL 3368922, at *4 ("District courts in
the Ninth Circuit have . . . held that 'the Second Amendment does not create a fundamental right to
carry a weapon in public.'") (quoting *Richards*, 821 F. Supp. 2d at 1174) (footnote and internal
punctuation omitted); *Young*, 911 F. Supp. 2d at 990 ("Unlike the law held unconstitutional in
*McDonald*, 130 S. Ct. 3020, which operated as a complete ban, or *Ezell*, which burdened gun

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION - 22**

governing conduct outside the home do not show that the law and facts clearly favor Plaintiffs'

success on the merits of their second claim.[13]

### C. The Regulation Does Not Implicate Conduct Falling Within the Scope of the Second Amendment's Protection.

Plaintiffs advance several arguments as to why they believe the regulation does not

withstand heightened scrutiny, but each argument is meritless.   Pl. Mot. at 16-18.   First,

Plaintiffs are incorrect that the Court must presume the Corps regulation to be unconstitutional,

and that the Corps must prove that the regulation is "narrowly tailored."   Pl. Mot. at 16-18.   Both

of these standards apply to laws reviewed under strict scrutiny.   But because Plaintiffs have

provided this Court with no basis for applying strict scrutiny, the cases they cite involving this

standard are inapposite.   *See Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299,

1306 (D.C. Cir. 2005) (requiring that postal regulation restricting expression in a "public forum"

---

ownership for self-defense in the home, Hawaii's Firearm Carrying Laws allow firearms to be carried in public between specified locations or with a showing of special need.").

13  Plaintiffs are simply mistaken that the Court must presume that the Corps regulation is unconstitutional and that the Corps of Engineers bears the burden of showing that the regulation is narrowly tailored to serve a compelling government interest.  Pl. Mot. at 15-18.  Rather, when evaluating Second Amendment claims, courts begin by asking whether the challenged law regulates conduct that falls within the scope of the Second Amendment's protection.   *See Nat'l Rifle Ass'n v. ATF*, 700 F.3d 185, 194 (5th Cir. 2012) (citing cases), *pet. for cert. filed*.   The Corps regulation does not because it is a law restricting the carrying of firearms in sensitive places, which is "presumptively lawful" under *Heller*.   554 U.S. at 626, 627 n.26.   In any event, even if the regulation did implicate conduct protected by the Second Amendment, it easily survives the "reasonableness" test employed by courts reviewing regulations enacted by the government in its capacity as proprietor of government property, or even the somewhat more stringent intermediate scrutiny test employed by numerous courts evaluating other types of firearms regulations. Because these merits arguments would be more pertinent if this case were to proceed to adjudication on the merits, rather than at this preliminary stage – and in the interests of space – Defendants have not presented these arguments in this motion.   However, if the Court wishes any of these topics to be addressed at this stage, Defendants respectfully request the opportunity to provide supplemental briefing on these issues.

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 23**

for First Amendment purposes must be "narrowly tailored to serve a significant government interest").    Second, Plaintiffs provide no support for their contention that the Corps regulation is constitutionally impermissible simply because it applies to firearms carried in motor vehicles. *See* Pl. Mot. at 16.   The cases Plaintiffs cite for this proposition do not involve regulations that were deemed unconstitutional merely because their scope included conduct in vehicles.   *See Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1315 (D.C. Cir. 2005) ("It is clear that a broadscale prohibition against asking postal patrons to sign petitions at other locations, whether such requests are made verbally or in distributed pamphlets, is unconstitutional even if all postal properties are nonpublic forums."); *Martin v. City of Struthers*, 319 U.S. 141, 142 (1943) (involving ordinance prohibiting any person from distributing handbills, circulars, or other advertisements door-to-door).   Even *Goodman v. City of Kansas City*, 906 F. Supp. 537 (W.D. Mo. 1995), never stated that the city ordinance at issue violated the First Amendment simply because its ban on the expression of political speech extended to bumper stickers on motor vehicles.   *See id.* at 539 (challenged ordinance prohibited city employees from making any public display of political support of any local judicial, mayoral, or council candidate, including wearing buttons, displaying bumper stickers or signs, and participating in political campaign activities). Indeed, courts have upheld firearms regulations pertaining to the possession of loaded firearms in vehicles against Second Amendment challenges.   *See Masciandaro*, 638 F.3d at 473-74 (upholding federal regulation prohibiting possession of loaded handguns in motor vehicles on national park land); *United States v. Parker*, 919 F. Supp. 2d 1072, 1082-85 (E.D. Cal. 2013) (upholding federal regulation prohibiting possession of weapon on national park land in violation of federal and state law, as applied to state law prohibiting carrying a concealed firearm within a

motor vehicle).   Thus, the mere fact that the Corps regulation reaches conduct in a motor vehicle does not make it constitutionally impermissible.

Third, Plaintiffs are simply incorrect in their contention that the Corps regulation includes "no moderating limitations," such as those incorporated in other firearms laws that have withstood Second Amendment challenges.   Pl. Mot. at 17.   The Corps regulation permits visitors to carry unloaded firearms on Corps-managed lands, and to possess loaded firearms (1) when the District Commander has provided written permission; (2) at authorized shooting ranges; or (3) when being used for hunting and fishing (except where expressly prohibited).   36 C.F.R. § 327.13(a).   The Corps regulation is thus similar to other "place" regulations on firearms possession upheld against Second Amendment challenges, including by courts in this Circuit.   *See Warden v. Nickels*, 697 F. Supp. 2d 1221, 1224, 1228-30 (W.D. Wash. 2010) (upholding against state constitutional challenge rule prohibiting carrying concealed or openly displaying firearms in parks facilities in Seattle where children are likely to be present); *Young v. State of Hawaii*, 911 F. Supp. 2d 972, 990 (D. Haw. 2012). ("Unlike the law held unconstitutional in *McDonald*, 130 S. Ct. 3020, which operated as a complete ban, or *Ezell*, which burdened gun ownership for self-defense in the home, Hawaii's Firearm Carrying Laws allow firearms to be carried in public between specified locations or with a showing of special need.").   In sum, Plaintiffs are simply incorrect that the Corps regulation imposes a total ban on firearms possession on Corps-managed lands, with no moderating limitations.

Fourth, Plaintiffs err in contending that the Corps regulation is broader than most other regulations of firearms on federal property.   Pl. Mot. at 17.   Many other federal statutes and regulations prohibit firearms on government property.   *See*, *e.g.*, 32 C.F.R. § 1903.10 (Central Intelligence Agency) (prohibiting "[k]nowingly possessing or causing to be present a weapon on

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 25**

an Agency installation," including "incident to hunting or other lawful purposes," defined as "property within the Agency Headquarters Compound and the property controlled and occupied by the Federal Highway Administration located immediately adjacent to such Compound, and property within any other Agency installation and protected property (i.e., property owned, leased, or otherwise controlled by the Central Intelligence Agency")); 32 C.F.R. § 234.10 (Department of Defense) (prohibiting "possessing, carrying, or using" a weapon while on the "Pentagon Reservation," defined as "Area of land and improvements thereon . . . includ[ing] all roadways, walkways, waterways, and all areas designated for the parking of vehicles").[14]

Even the statute identified by Plaintiffs as appropriately balancing "the need for security" with constitutional guarantees specifically authorizes the prohibition of firearms on federal facilities except "incident to hunting or other lawful purposes."   Brief in Support of Pl. Mot. (ECF No. 4-1) at 17 (citing 18 U.S.C. § 930).   To the extent that Plaintiffs construe this exception as permitting any carrying of firearms on federal facilities for the purpose of self-defense, Plaintiffs are mistaken.   The statute does not say that the prohibition "shall not apply to the lawful carrying of firearms or other dangerous weapons in a Federal facility [when the individual is present for] hunting or other lawful purposes."   18 U.S.C. § 930(d)(3).   Instead, it says that § 930(a) "shall not apply to the lawful carrying of firearms or other dangerous weapons in a Federal facility *incident to* hunting or other lawful purposes."   *Id.* (emphasis added).   The difference is critical.

---

14 *See also* 31 C.F.R. § 407.13 (Department of Treasury) ("No person while on the property shall carry firearms, or other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes."); 38 C.F.R. § 1.218(a)(13) (Department of Veterans Affairs) ("No person while on property shall carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes."); 36 C.F.R. § 504.14 (Smithsonian Institution Building and Grounds) ("No person while on the premises shall carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes.").

Although § 930 does not define the word "incident," dictionaries define it to mean "something dependent upon, appertaining or subordinate to, or accompanying something else of greater or principal importance . . .," *Black's Law Dictionary* 762 (6th ed. 1990); *see also* Merriam-Webster Online Dictionary ("1: something dependent on or subordinate to something else of greater or principal importance").[15]   Giving effect to this definition, it is not enough that an individual carries a firearm in a Federal facility where he is present for a "lawful purpose;" rather, the "lawful purpose" must depend on or in some way relate to the carrying of a firearm in the Federal facility. The only court to have construed § 930(d)(3) reached the same conclusion.   *See United States v. de la Cruz-Bancroft*, 2010 WL 8752034, at *2 (D.N.M. Jan. 4, 2010) ("[B]y its express terms the statute demands inquiry into defendant's purpose in bringing the firearm to a Federal facility.   In other words, the possession of the firearm must be not only lawful, but also must be for a *lawful purpose that is related to the federal facility*.   Any other interpretation would fail to give full effect to every word in the statute.") (emphasis added).

Similar to 18 U.S.C. § 930, the Corps regulation permits the carrying of firearms incident to hunting or fishing (including permitting the carrying of unloaded firearms when being transported to, from, or between hunting and fishing sites).   36 C.F.R. § 327.13(a)(2). Section 930 allows for the prohibition of firearms in any "Federal facility," as well as on the grounds "appurtenant to such building."   *See* 18 U.S.C. § 930(f) ("Nothing in this section limits the power of a court of the United States to punish for contempt or to promulgate rules or orders regulating, restricting, or prohibiting the possession of weapons within any building housing such court or any of its proceedings, or *upon any grounds appurtenant to such building*.") (emphasis

---

15  Available at http://www.merriam-webster.com/dictionary/incident.

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 27**

added).   In any event, Plaintiffs' assumption that a federal statutory right regarding the carrying of firearms must reflect a federal constitutional entitlement is false.   Congress is always free to confer statutory rights on individuals that extend above the constitutional floor.[16]   Thus, Plaintiffs have failed to establish that the scope of the Corps regulation differs significantly from the scope of protection provided by other federal statutes and regulations governing firearms use on federal property.[17]

In sum, Plaintiffs have failed to demonstrate that the facts and law clearly favor their success on the merits.   The Court should thus decline to issue a mandatory preliminary injunction.

## III.   Granting the Requested Preliminary Relief Would Harm Defendants and the Public Interest.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."   *Winter*, 555 U.S. at 24 (citation and internal punctuation omitted).   Here, the entry of preliminary relief against the Corps would both harm the Corps and run counter to the public interest.

The harms to the public and the Corps if it is unable to enforce its firearms regulation include safety concerns for the unarmed Park Rangers and visitors, security problems for dams, levees, and hydropower facilities co-located within recreation areas, the inability to perform full safety and security evaluations to account for the presence of firearms, and the necessity to engage

---

16 *See, e.g.*, Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*; Civil Rights Act of 1991, 105 Stat. 1071; Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*; Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

17 Finally, as explained above, and contrary to Plaintiffs' suggestion, a firearms regulation need not require an affirmative showing that "a gun [is] possessed with criminal intent" to be constitutional.   Pl. Mot. at 18.   *See Skoien*, 614 F.3d at 640 ("That some categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details.").

in the extensive rule-making process required to promulgate new regulations.   *See* Austin Decl.,

¶¶ 5-6.    Moreover, in this Circuit, any delay by a plaintiff in seeking preliminary injunctive relief

factors into the court's analysis of the balance of equities.[18]   Plaintiffs' months-long delay casts

serious doubt upon their assertions that they will suffer imminent irreparable injury if they are not

granted mandatory preliminary relief.   And while Plaintiffs note that the result of their requested

injunction will be that Idaho law will govern Corps-administered lands, Pl. Mot. at 19, that

response is tantamount to arguing that there is no essential difference between publicly-managed

land that supports critical infrastructure and non-public land.   *See* Austin Decl. ¶¶ 5-6 (discussing

the critical infrastructure maintained by the Corps on the lands it manages).   Moreover, allowing

state law to supplant federal law on federally-administered lands would not further the public

interest, since there are specific duties and powers exercised by the Corps which are not shared

with the State of Idaho.   Austin Decl., ¶ 5.   Plaintiffs have thus failed to show that the balance of

the equities favors them, much less that it "clearly" favors them, as they are required to show when

seeking a mandatory injunction.

---

18 *See*, *e.g., Western Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (in
balancing the equities and analyzing the public interest, "[t]he District Court . . . properly exercised
its discretion in weighing Appellant's delay in seeking a preliminary injunction until after
construction began, was temporarily halted, and begun anew, and some $712 million had been
expended among the equitable factors"); *California Dump Truck Owners Ass'n v. Nichols*, 2012
WL 273162, at *9 (E.D. Cal. Jan. 30, 2012) ("[Plaintiff] had ample time to challenge the
Regulation prior to the January 1, 2012, effective date and chose not to do so until the relative last
minute.   To permit [plaintiff] to capitalize on that delay by awarding an injunction now would be
inequitable."); *Marilley v. McCamman*, 2011 WL 4595198, at *8 (N.D. Cal. Oct. 3, 2011)
(concluding, in analyzing balance of equities, that plaintiff's "delay in seeking a preliminary
injunction strongly suggests that the situation is not urgent"); *Saba v. Caplan*, 2010 WL 2681987,
at *6 (N.D. Cal. July 6, 2010) ("Put simply, Plaintiff's dilatory filing of this motion militates
against granting the relief he requests.   Any hardship facing Plaintiff is thus of his own making.")
(internal citation omitted); *see also* Charles Alan Wright *et al.*, *Federal Practice and Procedure* §
2946 (2d ed. 1995) (stating "the venerable maxim that equity aids the vigilant, not those who
slumber on their rights") (internal punctuation omitted).

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION - 29**

Additionally, it is in the public interest to permit the Corps to carry out the duties it has been assigned by Congress, and as long as the agency is complying with the law, the public interest is harmed by an order that would interfere with those duties.   *See Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory policy of Congress "is in itself a declaration of the public interest which should be persuasive" to courts); *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 581 (Fed. Cl. 2005) ("The balance of hardships and the balance of harms tip in plaintiff's favor, but the public interest is not served by interfering with the [agency's] procurement process so long as the Agency did not violate applicable laws and regulations."); *Consumers Power Co. v. Dep't of Energy*, 1981 WL 1265, at *8 (E.D. Mich. 1981) (denying motion for preliminary injunction because, *inter alia*, the public interest would have been disserved by interfering with the implementation of an agency program).

There is no legitimate argument that the Corps is not complying with its obligations under its governing statutes in this instance.    The issuance of preliminary relief enjoining the rule is precisely the sort of interference with agency legal obligations that runs contrary to the public interest.   And while it may be true that "[g]enerally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution," *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005), that general principle does not apply when a party has failed to demonstrate a constitutional violation.   *See id.* (concluding that the public interest did not support issuance of a preliminary injunction where plaintiffs had failed to demonstrate a likelihood of success on the merits of their constitutional claim).   Because Plaintiffs have failed to show that the law and facts clearly favor their eventual success on the merits, the public interest would not be advanced by granting Plaintiffs a mandatory preliminary injunction.

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 30**

Respectfully submitted this 5th day of September, 2013.

WENDY J. OLSON
UNITED STATES ATTORNEY


/s/ Joanne P. Rodriguez
JOANNE P. RODRIGUEZ
ASSISTANT UNITED STATES ATTORNEY

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 31**

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 5th day of September, 2013, the foregoing **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following person(s):

James M. Manley
Jmanley@mountainstateslegal.com

John L. Runft
Jrunft@runftsteele.com

Steven J. Lechner
Lechner@mountainstateslegal.com


I HEREBY CERTIFY that on this same day a copy was mailed via United States Postal

Service-prepaid to the following person(s):

NA


/s/ Danielle Narkin
Danielle Narkin
Legal Assistant

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 32**