STUART F. DELERY
Assistant Attorney General
WENDY J. OLSON, Idaho State Bar No. 7634
United States Attorney
JOANNE P. RODRIGUEZ, Idaho State Bar No. 2996
Assistant United States Attorney
DIANE KELLEHER
Assistant Branch Director
DANIEL RIESS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Telephone: (202) 353-3098
Facsimile: (202) 616-8460
Daniel.Riess@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **ELIZABETH E. MORRIS and ALAN C. BAKER,** | **Case No. 3:13-CV-00336-BLW** |
| **Plaintiffs,** | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| **U.S. ARMY CORPS OF ENGINEERS, et al.,** | |
| **Defendants.** | |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATUTORY AND REGULATORY BACKGROUND ....................................................2

ARGUMENT ......................................................................................................3

I.      The Second Amendment Right to Keep and Bear Arms ....................................3

        A.      <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008)............................3

        B.      <u>United States v. Chovan</u>, 735 F.3d 1127 (9th Cir. 2013)........................4

II.     Because Public Land Managed by the Corps Is a Sensitive Place Under
        <u>Heller</u>, the Corps Regulation Does Not Burden Conduct Protected by the
        Second Amendment .......................................................................................5

        A.      The Second Amendment Does Not Protect a Right to Possess
                Firearms in Sensitive Places ...............................................................5

        B.      Public Land Managed and Administered by the Corps Is a
                Sensitive Place Under <u>Heller</u> ..............................................................7

III.    Even if the Corps Regulation Implicates Plaintiffs' Second Amendment
        Right, It Is Constitutional............................................................................11

        A.      The Regulation Is Permissible Because It Was Enacted by the
                Corps in Its Capacity as a Proprietor ................................................11

        B.      Even if Heightened Scrutiny Were Applicable, at Most,
                Intermediate Scrutiny Would Be the Appropriate Level of Review.....18

        C.      The Corps Regulation Substantially Relates to an Important
                Important Governmental Objective ....................................................20

                1.      Intermediate Scrutiny Review.................................................20

                2.      The Fit Between the Regulation and the Corps' Important
                        Objectives Satisfies Heightened Review ................................22

IV.     Any Permanent Relief Awarded Should Apply Only to the Two Named
        Plaintiffs....................................................................................................25

CONCLUSION.....................................................................................................26

## INTRODUCTION

Like many other federal agencies, the Corps has long restricted the possession of loaded firearms on its property under its constitutional and statutory authority as property owner.  See 36 C.F.R. § 327.13(a) ("Corps regulation") (prohibiting possession of loaded firearms on Corps-managed lands unless the firearm is possessed by a law enforcement officer or being used for hunting, fishing, or at a shooting range, or its possession is authorized by the District Commander).  As the largest provider of federal outdoor recreation based on annual visitation, the Corps has a firm and longstanding commitment to providing violence-free recreational areas, and the Corps regulation forms an important part of that commitment.

Plaintiffs contend that the Corps regulation violates their Second Amendment right to keep and bear arms because they wish to arm themselves when they visit Corps-managed lands in Idaho.  However, Plaintiffs' contention fails under both parts of the two-prong test adopted by the Ninth Circuit for addressing Second Amendment challenges to federal firearms restrictions in United States v. Chovan, 735 F.3d 1127 (9th Cir. 2013).  First, the Corps regulation does not burden conduct falling within the scope of the Second Amendment's guarantee.  Since the Founding era, the right to keep and bear arms has never been understood as an absolute or unlimited right.  Rather, reasonable time, place, and manner restrictions on firearm possession and use in the interest of public safety have always been seen as compatible with a robust Second Amendment right.  The Supreme Court made clear in District of Columbia v. Heller, 554 U.S. 570 (2008), that – however far the Second Amendment right extends – it does not extend to "sensitive places."  Id. at 626.  For the reasons detailed herein, Corps-managed property is a sensitive place under Heller, and thus the Corps regulation is presumptively lawful.

Even if the Court were to determine that the regulation does burden conduct within the

scope of the Second Amendment's guarantee, the regulation easily passes constitutional muster

under the second prong of the Ninth Circuit's two-part test.  The Corps regulation readily

survives the "reasonableness" test employed by courts reviewing regulations enacted by the

government in its capacity as proprietor of government property, as well as the somewhat more

stringent intermediate scrutiny test employed by the Ninth Circuit and numerous other courts

evaluating other kinds of firearms regulations.  Because the Corps regulation is sufficiently

tailored to the compelling government interest in protecting public safety and preventing firearm

violence on Corps-managed property, the regulation passes muster under any applicable

standard, and the Court should enter summary judgment for Defendants.  Finally, even if the

Court were to grant relief in this case to the two individual plaintiffs, any such relief should

extend no further than necessary to restore them to their allegedly rightful positions.

## STATUTORY AND REGULATORY BACKGROUND

In Section 4 of the Flood Control Act of 1944, Congress authorized the Corps to

"construct, maintain, and operate public park and recreational facilities at water resource

development projects under the control of the Department of the Army."  16 U.S.C. § 460d.  The

Act provides that "all such projects shall be open to public use generally" for various

"recreational purposes, . . . when such use is determined by the Secretary of the Army not to be

contrary to the public interest, all under such rules and regulations as the Secretary of the Army

may deem necessary."  Id.; see also South Dakota v. Bourland, 508 U.S. 679, 690 (1993)

(quoting 16 U.S.C. § 460d) (noting that the Act "clearly prohibits any 'use' of the lands . . .

which is determined by the Secretary of the Army to be 'contrary to the public interest.'").

In accordance with this rulemaking authority, the Corps has issued regulations governing

public use of these projects.  36 C.F.R. Part 327.  The Corps "designed [these regulations] to

ensure safe, enjoyable and environmentally sound visitation on the public lands, free from unwanted disturbance."  Administrative Record ("AR") at 0000001.  Corps policy involves "manag[ing] the natural, cultural and developed resources of each project in the public interest, [and] providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources."  36 C.F.R. § 327.1(a).

The Corps regulates the possession and use of firearms at water resource development projects.  36 C.F.R. § 327.13.  Corps regulations allow for the carry and use of firearms and other weapons for hunting on a substantial portion of Corps project lands and waters, totaling millions of acres, provided that the hunting complies with State and local law.  See id. § 327.13(a)(2); Declaration of Stephen B. Austin ¶ 4.a [ECF No. 18-1] ("Austin Decl.").  Additionally, possession and use of firearms is authorized at approximately 32 public shooting ranges located on Corps-managed lands.  Id. § 327.13(a)(3); Austin Decl. ¶ 4.a.  Federal, State, and local law enforcement officers may also possess loaded firearms.  Id. § 327.13(a)(1); Austin Decl. ¶ 4.a.  Finally, firearms possession is authorized if the Corps District Commander has issued written permission.  Id. § 327.13(a)(4); Austin Decl. ¶ 4.a.

## ARGUMENT

I.    **The Second Amendment Right to Keep and Bear Arms**

A.    **District of Columbia v. Heller, 554 U.S. 570 (2008)**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In Heller, the Supreme Court held that a "ban on handgun possession in the home" and "prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense" violated the Second Amendment.  554 U.S. at 635.  But the

3

Court repeatedly emphasized that "the right was not unlimited." Id. at 595 ("[W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak *for any purpose*.") (emphases in original). The Court noted that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 635. Heller also made clear that laws forbidding firearms in sensitive places do not generally violate the Constitution. The Court explained: "[N]othing in our opinion should be taken to cast doubt on . . . *laws forbidding the carrying of firearms in sensitive places* such as schools and government buildings . . . ." Heller, 554 U.S. at 626 (emphasis added). And the Court specifically noted that those "presumptively lawful regulatory measures" were merely examples, and that the list "does not purport to be exhaustive." Id. at 627 n.26.

**B.**   **United States v. Chovan, 735 F.3d 1127 (9th Cir. 2013)**

Interpreting Heller in the context of a Second Amendment challenge to 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by a person convicted of misdemeanor domestic violence, the Ninth Circuit adopted "a two-step Second Amendment inquiry." Chovan, 735 F.3d at 1136. This inquiry "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." Id. (citations omitted); accord Jackson v. City & Cnty. of San Francisco, 746 F.3d 953, 960 (9th Cir. 2014).[1]

_____

[1] Peruta v. County of San Diego, 742 F.3d 1144 (9th Cir. 2014), is not on point here because that case involved a challenge to a general restriction on the ability to carry a firearm in nearly all public locations, not a regulation limited only to government-owned property. See id. at 1147 ("California generally prohibits the open or concealed carriage of a handgun, whether loaded or unloaded, in public locations.") (citations and footnote omitted). In any event, Peruta repeated

II.     **Because Public Land Managed by the Corps Is a Sensitive Place Under <u>Heller</u>, the Corps Regulation Does Not Burden Conduct Protected by the Second Amendment.**

   A.     **The Second Amendment Does Not Protect a Right to Possess Firearms in Sensitive Places.**

"In analyzing the scope of the Second Amendment," courts in this Circuit must "begin with the list of 'presumptively lawful' regulations provided by <u>Heller</u>." <u>Jackson</u>, 746 F.3d at 962 (citations omitted).  One such presumptively lawful regulation is "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." <u>Heller</u>, 554 U.S. at 626. Such laws address conduct that falls outside the scope of the Second Amendment's protection. <u>See</u> <u>United States v. Marzzarella</u>, 614 F.3d 85, 91-92 (3d Cir. 2010) (concluding, after extensive analysis, that the presumptively lawful regulatory measures identified in <u>Heller</u> concern "exceptions to the right to bear arms" to which "the Second Amendment affords no protection"), <u>cert. denied</u>, 131 S. Ct. 958 (2011); <u>Hall v. Garcia</u>, No. 10-3799, 2011 WL 995933, at *2 (N.D. Cal. Mar. 17, 2011) ("Where a challenged statute apparently falls into one of the categories signaled by the Supreme Court as constitutional, courts have relied on the 'presumptively lawful' language to uphold laws in relatively summary fashion.") (citing cases).

The Second Amendment right is subject to "traditional restrictions," which tend "to show the scope of the right." <u>McDonald v. Chicago</u>, 130 S. Ct. 3020, 3056 (2010) (Scalia, J., concurring).  "[W]hen the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee." <u>NRA v. ATF</u>, 700 F.3d 185, 200 (5th Cir. 2012), <u>cert. denied</u>, 134 S. Ct. 1364 (2014).  "Since even before the

---

the Supreme Court's statement in <u>Heller</u> that its opinion should not be read to "'cast doubt on' . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." <u>Id.</u> at 1178 (quoting <u>Heller</u>, 554 U.S. at 626).  Moreover, as of the time of this filing, petitions for <u>en banc</u> reconsideration of the <u>Peruta</u> panel decision are pending before the Ninth Circuit.

Revolution, gun use and gun control have been inextricably intertwined" and "[t]he historical record shows that gun safety regulation was commonplace in the colonies," including "laws prohibiting the use of firearms on certain occasions *and in certain places*."  Id. (emphasis added).

Forbidding the carrying of firearms in sensitive places is consistent with nineteenth-century State cases analyzing the Second Amendment and State analogues.  As these decisions explain, the government retains authority to impose firearms restrictions "as is necessary for the preservation of the peace, the protection of the person and property of the citizens, and the fulfillment of [its] other constitutional duties."  Hill v. State, 53 Ga. 472, 482-83 (Ga. 1874). Accordingly, "the right to keep and bear arms is not infringed if the exercise of it be by law prohibited at places and times when a proper respect for the majesty of the law, a sense of decency and propriety, or the danger of a breach of the peace, forbid it."  Id. at 479.

State courts have thus readily upheld prohibitions on firearms in a wide variety of public and private settings.  For example, the Texas Supreme Court upheld an 1871 statute that prohibited carrying firearms in specified places including churches, religious assemblies, school rooms, or "other place[s] where persons are assembled for amusement or for educational or scientific purposes."  See English v. State, 35 Tex. 473 (1871) (upholding Act of Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws 25-26).  The Texas Supreme Court considered it "little short of ridiculous, that one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly."  Id. at 478.  Similar provisions applicable to various public places in other States were likewise not thought to offend the right to bear arms.  See id. at 479 ("It is safe to say that almost [all], if not every one of the states of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration.");  Hill, 53

Ga. 472 (upholding Act of Oct. 18, 1870, No. 285, 1870 Ga. Laws 421, which prohibited

firearms at courts, election grounds, and "any other public gathering"); State v. Shelby, 2 S.W.

468, 469 (Mo. 1886) (noting that Missouri Supreme Court had upheld law that prohibited

firearms at a number of places including "any school-room or place where people are assembled

for educational, literary, or social purposes.").

 In sum, both history and precedent make clear that laws such as the Corps regulation,

which restricts the carrying of firearms in sensitive places, do not burden conduct protected by

the Second Amendment.

### B. Public Land Managed and Administered by the Corps Is a Sensitive Place Under Heller.

 Because the Corps regulation is a "law[] forbidding the carrying of firearms in [a]

sensitive place[]," Heller, 554 U.S. at 626, it does not burden conduct protected by the Second

Amendment.[2]   As noted above, the Supreme Court made clear that the specific "presumptively

lawful regulatory measures" identified in Heller serve "only as examples" and do not constitute

an exhaustive list.   Id. at 626-27 & n.26.   Moreover, the use of the term "such as" before

"schools and government buildings" necessarily implies that laws forbidding firearms in places

other than the inside of schools and government buildings may be "presumptively lawful" under

the sensitive places doctrine.   In fact, a number of courts – including courts in this Circuit – have

relied on Heller to uphold restrictions on firearms in sensitive places other than the inside of

schools and government buildings.   In United States v. Davis, 304 F. App'x 473 (9th Cir. 2008)

(unpublished), the Ninth Circuit upheld a conviction for carrying concealed firearms on an

---

[2] A determination of this issue is not foreclosed by the Court's January 10, 2014 memorandum decision and order [ECF No. 42] ("January 10 Order"), because that Order did not decide whether Corps-managed land is a "sensitive place[]" under Heller.   554 U.S. at 626.

airplane because "[t]he Supreme Court specified that nothing in that opinion was intended to cast doubt on the prohibition of concealed weapons in sensitive places."  Id. at 474.  And Warden v. Nickels, 697 F. Supp. 2d 1221 (W.D. Wash. 2010), upheld a ban on firearms at a city-owned park as a "permissible restriction on the possession of firearms in a 'sensitive' place" and found "no logical distinction between a school on the one hand and a community center where educational and recreational programming for children is also provided on the other.  Just as the Federal Courts do not want civilians entering into courthouses with weapons, the City does not want those with firearms entering certain parks where children and youth are likely present."  Id. at 1224, 1229.[3]  Moreover, Hall upheld a statute prohibiting firearms possession on "the grounds of a public or private school engaged in kindergarten through twelfth-grade education and areas within 1000 feet of such property," explaining that "[f]or the same reason that schools are sensitive places – the presence of large numbers of children either at school or traveling to and from it – possession of firearms within some distance around such locations similarly presents the risk of danger and disruption."  Hall, 2011 WL 995933, at *1, 4.[4]

---

[3] Warden predated the Supreme Court's decision in McDonald, and the court dismissed the plaintiff's Second Amendment challenge on the basis of then-controlling Ninth Circuit precedent holding that the Second Amendment constrains only the actions of the federal government, not the states.  697 F. Supp. 2d at 1225-26.  However, the court also analyzed the question whether the Park rule violated Article I, § 24 of the Washington State Constitution, the state parallel to the Second Amendment, relying on the Washington Supreme Court's decision to analyze that provision in light of Heller.  Id. at 1228-29 (citing State v. Sieyes, 225 P.3d 995 (Wash. 2010)).

[4] See also United States v. Dorosan, 350 F. App'x 874, 875 (5th Cir. 2009) (government-owned postal property), cert. denied, 559 U.S. 983 (2010); Moore v. Madigan, 708 F.3d 901, 904 (7th Cir. 2013) (because "Heller itself endorsed restrictions in 'sensitive' places, such as schools and government buildings," it "should not be difficult to make reasonable arguments to support extending that reasoning to areas around schools, courthouses, other government buildings, public universities, public libraries, hospitals, medical offices, public parks and forests, churches and other places of worship, banks, shopping centers, public transportation facilities and vehicles, and venues for sporting events, concerts, and other entertainment, among many possible examples") (Hamilton, J., dissenting from denial of rehearing en banc) (footnote omitted); United States v. Masciandaro, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009) (motor

Several characteristics of Corps-managed land qualify it as a "sensitive place" under Heller. First, "open space venues, such as County-owned parks, recreational areas, [and] historic sites * * * * fit comfortably within the same category as schools and government buildings" expressly addressed in Heller because they are "gathering places where high numbers of people might congregate." Nordyke v. King, 563 F.3d 439, 459-60 (9th Cir. 2009), vacated, 611 F.3d 1015 (9th Cir. 2010);[5] see also Doe v. Wilmington Hous. Auth., 880 F. Supp. 2d 513, 531 (D. Del. 2012) ("Open-space venues, where large numbers of people might congregate, as well as places used for government business or important to government functioning, have also been found to be sensitive places.") (citing Nordyke, 563 F.3d at 460); Embody, 2011 WL 2971055, at *11 ("Given that Plaintiff was in personal possession of a loaded weapon in a public park, the Court concludes that the temporary seizure of Plaintiff's weapon did not violate the Second Amendment.") (footnote omitted).

Corps-administered public lands contain open public spaces in which large numbers of people congregate. The Corps manages 422 projects (mostly lakes) in 43 states and is the

_____

vehicles on national park land), aff'd on other grounds, 638 F.3d 458 (4th Cir. 2011), cert. denied, 132 S. Ct. 756 (2011); Embody v. Ward, No. 10-126, 2011 WL 2971055, at *10-11 (M.D. Tenn. July 20, 2011) (public park), aff'd on other grounds, 695 F.3d 577 (6th Cir. 2012); DiGiacinto v. Rector & Visitors of George Mason Univ., 704 S.E.2d 365, 369-70 (Va. 2011) (college campus); but see Bonidy v. U.S. Postal Serv., No. 10-2408, 2013 WL 3448130, at *3-4 (July 9, 2013) (post office building, but not post office parking lot, is a sensitive place), appeals docketed.

[5] The court first held, after a lengthy analysis, that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment and applies it against the states and local governments. Nordyke, 563 F.3d at 457. The Ninth Circuit later vacated that decision and remanded to the panel for further consideration in light of McDonald v. City of Chicago. Nordyke v. King, 611 F.3d 1015 (9th Cir. 2010). Nevertheless, the Ninth Circuit's analysis of the "sensitive places" doctrine is instructive. See Texeira v. County of Alameda, No. 12-3288, 2013 WL 707043, at *5 n.2 (N.D. Cal. Feb. 26, 2013) ("Although its original decision is vacated, the panel's analysis of laws regulating guns in sensitive places has been recognized by other courts.") (citing Brown v. United States, 979 A.2d 630, 641 (D.C. 2009); Masciandaro, 648 F. Supp. 2d at 790-91); Embody, 2011 WL 2971055, at *11 (citing Nordyke).

steward of 12 million acres of land and water used for recreation, with 54,879 miles of shoreline. See U.S. Army Corps of Engineers, Information Paper, Subject: Civil Works Program Statistics (March 20, 2012) ("Information Paper") [ECF No. 18-2].  More than 90% of the lakes that support Corps-managed projects are located near metropolitan areas, id., and roughly 80% of Corps recreation areas are within 50 miles of an urban area.  Congressional Research Service, Firearms at Army Corps Water Resources Projects: Proposed Legislation and Issues for Congress (July 12, 2012) ("CRS Report"), at 1 [ECF No. 18-3].[6]  In general, Corps-managed recreational facilities have a high density of use because many such facilities are located near major population centers.  Austin Decl. ¶ 5.c.  Corps-managed projects receive 370 million visits per year, making its projects the most visited of any single federal agency's sites.  See Information Paper.  Ten percent of the U.S. population visits a Corps-managed project at least once a year.  Id.  The Corps hosts 20% of all visits to federal recreation areas on just 2% of the federal land base.  Id.

    Second, Corps-managed projects open to the public for recreation include projects containing important infrastructure such as dams and levees.  See Information Paper.  The Corps owns and operates 702 dams and 227 navigational locks, and has built or controls 14,501 miles of levees.  Id.  The U.S. Department of Homeland Security's Office of Inspector General has characterized "[d]ams and related structures," including those operated and managed by the Corps, as "critical infrastructure," given that "one catastrophic failure at some locations could affect populations exceeding 100,000 and have economic consequences surpassing $10 billion." Department of Homeland Security, Office of Inspector General, DHS Risk Assessment Efforts in

---

[6] CRS issued an updated version of this Report on September 4, 2013, which is available at https://www.hsdl.org/?view&did=745155.

the Dams Sector (2011), at 1, 2;[7] see also CRS Report at 3 ("The Corps and the U.S. Department of Homeland Security regard some Corps infrastructure as critical to homeland security and the economy; these structures include multi-purpose dams and major navigation locks.") (footnote omitted).  Many of these Corps-managed facilities "require additional protection measures in times of heightened homeland security concerns."  CRS Report at 3.

In short, Corps-administered public land, including the Idaho land at issue in this case, contain open public spaces on which large numbers of people congregate, and important infrastructure such as dams and levees is located on this land.  As with the recreational public land at issue in cases such as Nordyke, Warden, and Doe, Corps-managed public land is a "sensitive place" under Heller.  The Corps regulation is thus "presumptively lawful," 554 U.S. at 626-27, and the Court should uphold the regulation on that basis.

**III.    Even if the Corps Regulation Implicates Plaintiffs' Second Amendment Right, It Is Constitutional.**

        **A.    The Regulation Is Permissible Because It Was Enacted by the Corps in Its Capacity as a Proprietor.**

If the Court were to determine that the Corps regulation burdens protected conduct, it must "apply an appropriate level of scrutiny."  Chovan, 735 F.3d at 1136.  Here, because the Corps was acting in its proprietary capacity when it enacted the challenged regulation, its action is reviewed under a lower standard of constitutional scrutiny, and the regulation satisfies that standard.

The Corps is mindful that in an earlier order, the Court stated that the government-as-proprietor standard referenced in Nordyke v. King, 681 F.3d 1041 (9th Cir. 2012) (en banc), should not apply here.  See January 10 Order at 8.  The Corps respectfully requests that the Court

---

[7] *Available at* http://www.oig.dhs.gov/assets/Mgmt/OIG_11-110_Sep11.pdf.

reconsider its ruling on this issue because <u>Nordyke</u> demonstrates that this standard applies when, as here, the government takes action as proprietor with respect to property it owns and manages, rather than as a legislator.

At issue in <u>Nordyke</u> was a county ordinance that prohibited the possession of a firearm or ammunition on county property.  681 F.3d at 1044.  However, as interpreted by the county, the ordinance allowed gun-show promoters to possess firearms for sale while conducting a gun show on county property, provided that when a firearm was not in the promoters' actual possession, it would be secured to prevent unauthorized use.  <u>Id.</u>  The Ninth Circuit held: "Thus read, the ordinance regulates the sale of firearms at Plaintiffs' gun shows only minimally, *and only on County property*.  No matter how broad the scope of the Second Amendment – an issue that we leave for another day – it is clear that, as applied to Plaintiffs' gun shows and as interpreted by the County, this regulation is permissible."  <u>Id.</u> (emphasis added).  To demonstrate that this regulation "only on County property" was permissible, the Ninth Circuit cited, <u>inter</u> <u>alia</u>, <u>Engquist v. Oregon Department of Agriculture</u>, 553 U.S. 591, 598 (2008), a case involving an equal protection claim against a government employer, for the proposition that "there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation" (internal punctuation omitted), and <u>United States v. Kokinda</u>, 497 U.S. 720, 725 (1990), as "recognizing a distinction, for First Amendment purposes, between governmental exercise of the power to regulate or license, as law-maker and governmental actions taken in its role as proprietor, to manage its internal operations" (internal punctuation omitted).  By citing these cases applying the government-as-proprietor standard, the Ninth Circuit made clear that firearms regulations are subject to this standard of constitutional scrutiny when – as here – the

government regulates conduct only on property it owns.

Moreover, though Nordyke did not employ the phrase "self-defense," that omission does not make the government-as-proprietor standard from Kokinda and Engquist inapplicable here. While Heller observed that "the inherent right of self-defense has been central to the Second Amendment right," 554 U.S. at 628, the activity at issue in Kokinda – soliciting contributions for political activity on a sidewalk near a Post Office entrance – was "a recognized form of speech protected by the First Amendment."  Kokinda, 497 U.S. at 725.  But the fact that the First Amendment protected such activity did not prevent the Supreme Court from applying the government-as-proprietor standard and upholding the Postal Service's regulation prohibiting such activity.  Thus, even assuming that the Second Amendment protects Plaintiffs' possession of firearms on Corps-managed property, that does not render the government-as-proprietor standard inapplicable here.  See Dorosan, 350 F. App'x at 875 (U.S. Postal Service's "restrictions on guns stemmed from its constitutional authority as the property owner" of the land to which the restriction applied); Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense, 56 UCLA L. Rev. 1443, 1475 (2009) ("Nevertheless, there is both precedent and reason for allowing the government acting as proprietor extra power to restrict the exercise of many constitutional rights on its property.  This suggests that *separate government-as-proprietor standards may likewise be proper for the right to keep and bear arms*, whether in government buildings, by government employees, in government-owned parks, in government-owned housing, and so on.") (footnote omitted) (emphasis added).

Where, as here, the government is "acting in its proprietary capacity," its action is valid "unless it is unreasonable, arbitrary, capricious, or invidious."  Kokinda, 497 U.S. at 725-26 (citation and internal punctuation omitted); see also id. at 737, 740 (concluding that regulation

prohibiting "[s]oliciting alms and contributions on postal premises" "passes constitutional muster under the Court's usual test for reasonableness") (internal citations omitted); <u>Int'l Soc'y for Krishna Consciousness, Inc. v. Lee</u>, 505 U.S. 672, 679-80, 683 (1992) (noting that "government – like other property owners – has power to preserve the property under its control for the use to which it is lawfully dedicated" and finding "no doubt" that restriction on solicitation in government-operated airport passes muster under "reasonableness" test) (citations omitted). Under this standard, a regulation is valid if it is consistent with the government's legitimate interest in maintaining the property for its dedicated use.  <u>Initiative & Referendum Inst. v. U.S. Postal Serv.</u>, 685 F.3d 1066, 1073 (D.C. Cir. 2012) (citing <u>Perry Educ. Ass'n v. Perry Local Educators Ass'n</u>, 460 U.S. 37, 50-51 (1983)) (holding that regulation banning collection of signatures on interior post office sidewalks did not violate First Amendment's free speech clause).  "And the restriction 'need only be reasonable; it need not be the most reasonable or the only reasonable limitation.'"  <u>Id.</u> (emphasis in original) (quoting <u>Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 473 U.S. 788, 808 (1985)).

        The Corps issued the regulation here under its constitutional and statutory authority to issue "such rules and regulations as the Secretary of the Army may deem necessary" to administer the public use of park and recreational facilities at water resource development projects under the Army's control.  16 U.S.C. § 460d.  This authority includes the ability to "prohibit[] any 'use' of the lands . . .  which is determined by the Secretary of the Army to be 'contrary to the public interest."  <u>Bourland</u>, 508 U.S. at 690.  "Beyond doubt, the Property Clause authorizes the enactment and enforcement of regulations which . . . are designed to maintain safety and order on government property."  <u>United States v. Gliatta</u>, 580 F.2d 156, 160 (5th Cir. 1978).  The Corps regulation is particularly reasonable in light of the fact that when it manages

14

public land, the United States "exercises the powers both of a proprietor and of a legislature." Kleppe v. New Mexico, 426 U.S. 529, 540 (1976) (citations omitted); see also United States v. Gardner, 107 F.3d 1314, 1318 (9th Cir. 1997) ("The Supreme Court has consistently recognized the expansiveness of [the Property Clause] power, stating that '[t]he power over the public land thus entrusted to Congress is without limitations.'") (quoting Kleppe, 426 U.S. at 539); Light v. United States, 220 U.S. 523, 536 (1911) ("The United States can prohibit absolutely or fix the terms on which its property may be used. . . . These are rights incident to proprietorship, to say nothing of the power of the United States as a sovereign over the property belonging to it.").

The policy of the Secretary of the Army, acting through the Corps, is "to manage the natural, cultural and developed resources of each [Corps-managed] project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing these resources." 36 C.F.R. § 327.1. The Corps must consider a number of factors when deciding whether the public interest is furthered by opening Corps-managed lands for recreation, and when developing rules for their recreational use. Austin Decl. ¶ 5.a. Developing rules regarding the possession of firearms on Corps-managed lands has required a delicate balancing of several of these factors, including the safety of visitors and of Corps employees; protection of natural, cultural, and developed resources; and promotion of recreational opportunities. Id.

As part of this balancing of factors, the Corps has considered how to structure its firearms rules to ensure the safety of visitors to the lands it manages. Austin Decl. ¶ 5.c. As noted above, see supra II.B, large numbers of visitors frequently congregate in the recreational facilities of Corps-administered lands. The Corps has considered potential sources of conflict among visitors and has enacted rules aimed at minimizing any such conflict. Austin Decl. ¶ 5.c. Some sources

15

of conflict include alcohol consumption, visitors' preference for different types of music played at different sound levels, and the relative loudness of visitors' conversations.  Id.  Such problems are often more acute at Corps-managed recreational areas, as contrasted with U.S. National Park Service recreational areas, because of the higher concentration of visitors on Corps lands.  Id.  Corps regulations address these issues by prescribing rules regarding, inter alia, the use of water vessels, swimming, sanitation, fires, control of animals, and establishing quiet hours.  Id.; see 36 C.F.R. §§ 327.3, 327.5, 327.9 – 327.11).  Corps regulations are aimed at ensuring that inevitable conflicts that arise as a result of disagreements about how different visitors make use of Corps recreational areas are resolved as quickly and peacefully as possible.  Austin Decl. ¶ 5.c.  The Corps has reasonably concluded that the presence of a loaded firearm could far more quickly escalate tensions resulting from such disagreements, and present a significant threat to public safety, involving the potential use of deadly force against a visitor or a Corps Park Ranger.  Id.[8]

    This balancing of factors has also included consideration of available law enforcement options.  Austin Decl. ¶ 5.e.  Corps Park Rangers are neither equipped nor trained to function as law enforcement officers because Congress has not authorized Corps employees to carry firearms, to execute search warrants, or to enforce any federal laws except for issuing citations for violations of regulations governing Corps-managed land.  Id.; see also AR at 491, 1009.

---

[8] In a 1996 survey, 62% of Rangers reported incidents of verbal abuse from visitors, and 46% reported that they had been physically threatened.  AR at 0000558.  53% of Rangers had witnessed between one and ten incidents in which a visitor verbally or physically threatened another visitor.  Id.  A 1995 survey revealed that each day, on average,  one Ranger was physically threatened, and nearly four Rangers were verbally abused or verbally assaulted; on average, a Ranger was assaulted once every six days.  AR at 0000675.  The number of these incidents greatly exceeded the number of incidents of threats against National Park Service officers.  Id.  A 1994 study reported that Rangers sometimes found themselves in potentially unsafe and dangerous situations, and that typically, such unsafe situations included those involving alcohol and drug use on project lands, and the use of weapons by the visiting public.  Id. at 0001090.

16

Corps Park Rangers are thus not authorized to enforce federal firearms laws.  Id.  Additionally, the Corps has reasonably determined that allowing armed visitors on Corps-managed lands could create a chilling effect on the enforcement of Corps regulations, because Congress has not authorized Corps Park Rangers to be armed.  Id.

The Corps firearms regulation represents a balancing of these factors, and is premised on the Corps' determination that the public interest is furthered by restricting the possession of loaded firearms on lands the Corps manages, unless the firearms are being used for hunting or target shooting, or being carried by a law enforcement officer or a visitor who has received permission from the District Commander.  Austin Decl. ¶ 5.f.  The possession of firearms on areas dedicated to hunting and target shooting does not undermine this determination, because these activities are undertaken only in appropriate locations and in a manner that is not likely to endanger other visitors' safety or threaten critical infrastructure.  Id. ¶ 5.d.  The regulation is consistent with the government's legitimate interest in maintaining the property for its dedicated use, as evidenced by the fact that owners of private campgrounds and open recreational areas in Idaho may choose not to permit the carrying of firearms on their property.  See Office of the Attorney General, State of Idaho, Concealed Weapons License FAQs, No. 16 (a "private business, which is open to the public [may] forbid[] carrying weapons on the business premises. Private businesses are within their rights to prohibit weapons on their property."); [9] see also AR at 0001636 ("While the Federal Government, through the Corps of Engineers, does have the authority to regulate conduct upon its lands as it relates to the purposes for which these lands are held (e.g., recreation), it exercises no traditional police power on such lands and holds them in a manner *analogous to that of a private landowner*.") (emphasis added); id. at 0001840 - 0001842.

---

[9] *Available at* http://www.ag.idaho.gov/concealedWeapons/concealedWeapons_index.html.

Clearly, Plaintiffs disagree with the policy judgment made by the Corps in enacting its firearms regulation.  However, Plaintiffs have not shown – and cannot show – that this regulation is "unreasonable, . . . arbitrary, capricious, or invidious."  Kokinda, 487 U.S. at 726.  As explained above, the Corps regulation was enacted to protect the safety of individuals who recreate on the public land it owns and administers.  Consequently, the Court should uphold the Corps regulation as a permissible regulation of the government's use of its own property.

**B.      Even if Heightened Scrutiny Were Applicable, at Most, Intermediate Scrutiny Would Be the Appropriate Level of Review.**

Even if this Court were to apply a more rigorous level of review, the Corps regulation would pass constitutional muster.  Courts addressing restrictions on the possession of firearms outside the home, such as the Corps regulation, have almost uniformly declined to apply a standard above intermediate scrutiny.[10]

Although in an earlier order, the Court found that strict scrutiny would be appropriate to the extent that Plaintiffs challenge the Corps regulation as applied to an individual possessing firearms in a tent on Corps land, January 10 Order at 5, the Corps respectfully requests that the Court reconsider this issue.  Heller "went to great lengths to emphasize the special place that the home – an individual's *private property* – occupies in our society."  GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1259 (11th Cir. 2012) (emphasis added) (citing 554 U.S. at 628-29),

---

[10] See Drake v. Filko, 724 F.3d 426, 435-36 (3d Cir. 2013) (applying intermediate scrutiny to law requiring showing of justifiable need to carry handguns in public), cert. denied, 82 U.S.L.W. 3449 (2014) ; Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 93-94 (2d Cir. 2012) (applying intermediate scrutiny to law requiring showing of proper cause to carry concealed handgun in public), cert. denied, 133 S. Ct. 1806 (2013); Woollard v. Gallagher, 712 F.3d 865, 874-83 (4th Cir. 2013) (applying intermediate scrutiny to state requirement that permit to carry, wear, or transport a handgun in public must be conditioned on showing of "good and substantial reason"), cert. denied, 134 S. Ct. 422 (2013); Masciandaro, 638 F.3d at 470-71 (applying intermediate scrutiny to federal regulation prohibiting the possession of a loaded handgun in a motor vehicle on national park land).

cert. denied, 133 S. Ct. 856 (2013).  Nothing in Heller suggests that the Supreme Court equated an individual's privately-owned home with a temporary overnight lodging on land neither owned nor managed by that individual.  And history provides no warrant for concluding that a person may assert the Second Amendment's "core" guarantee, 554 U.S. at 634, on publicly-owned and -managed property that he or she is merely visiting.  Additionally, that the Ninth Circuit has determined that "the Fourth Amendment protects a person's privacy interests in a tent located on a public campground," United States v. Gooch, 6 F.3d 673, 676 (9th Cir. 1995), does not warrant applying strict scrutiny here.  Even if substantive Fourth Amendment jurisprudence were relevant to the level of scrutiny afforded to firearms regulations under the Second Amendment, that jurisprudence recognizes a distinction between an individual's own dwelling and places that he or she is visiting.  See, e.g., Florida v. Jardines, 133 S. Ct. 1409, 1415 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals.  At the Amendment's 'very core' stands 'the right of a man to retreat into *his own home* and there be free from unreasonable governmental intrusion.'") (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)) (emphasis added).  By contrast, in discussing the Fourth Amendment's application to a person's own home, the Court has noted that "'our law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave.'" Id. (quoting Entick v. Carrington, 2 Wils. K.B. 275, 291 (K.B. 1765)).  Nothing in Fourth Amendment jurisprudence thus warrants extending the special protection afforded to a person's privately-owned home to encompass public property temporarily visited by him or her.

In an analogous case, the District of Delaware applied intermediate scrutiny to a provision forbidding the carrying of firearms by public-housing residents in common areas of their housing (except when transporting a firearm to or from a living unit).  Doe, 880 F. Supp. 2d

at 534-35.  The Court rejected the residents' argument that strict scrutiny was warranted because the provision "effectively eliminate[d] [the] residents' abilities to defend themselves in the common areas, in violation of the 'core lawful purpose of self-defense.'"  Id. at 534 (quoting Heller, 554 U.S. at 630).  The Court explained that "any time, place, and manner restriction can be construed as a prohibition on conduct during the time, at the place, or in the manner which the regulation precludes," and thus, "[t]o accept Plaintiffs' characterization of the Common Area Provision as a prohibition would eviscerate the distinction between a time, place, and manner regulation and an outright prohibition."  Id.  Similarly, the Corps regulation is a place restriction that should be reviewed under intermediate scrutiny.  Accepting Plaintiffs' mistaken characterization of this restriction as a "prohibition on conduct" "would eviscerate" any meaningful distinction between a time, place, and manner restriction and an outright prohibition.

In sum, to the extent that any heightened review is appropriate here, the Court should apply at most intermediate scrutiny.

**C.     The Corps Regulations Substantially Relates to an Important Governmental Objective.**

**1.     Intermediate Scrutiny Review**

Intermediate scrutiny requires "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective."  Chovan, 735 F.3d at 1139.  In applying intermediate scrutiny to the Corps regulation, several relevant factors should influence this Court's review.  First, "intermediate scrutiny permits authorities to paint with a broader brush than strict scrutiny."  Doe, 880 F. Supp. 2d at 535-36 (quoting Heller v. Dist. of Columbia, 698 F. Supp. 2d 179, 191 (D.D.C. 2010), aff'd in relevant part, 670 F.3d 1244 (D.C. Cir. 2011)).  Under intermediate scrutiny, "the fit between the challenged regulation and the asserted objective need only be reasonable, not perfect."

20

Schrader v. Holder, 704 F.3d 980, 990 (D.C. Cir. 2013) (internal punctuation omitted), cert. denied, 134 S. Ct. 512 (2013).

Second, under intermediate scrutiny, the government "does not bear the burden of providing evidence that rules out every theory . . . inconsistent with its own." City of Los Angeles v. Alameda Books, 535 U.S. 425, 437 (2002). Nor is the government limited to the "least restrictive means" of achieving its end or the "single best disposition" but rather "one whose scope is in proportion to the interest served." Bd. of Trs. of State Univ. of New York v. Fox, 492 U.S. 469, 480 (1989) (internal citations omitted). In other words, the government "need not adopt the most narrowly tailored means available." Initiative & Referendum Inst., 685 F.3d at 1073; see also Kachalsky, 701 F.3d at 97 ("Unlike strict scrutiny review, we are not required to ensure that the [government's] chosen means is 'narrowly tailored' or the least restrictive available means to serve the stated governmental interest.") (citation and internal punctuation omitted).

Finally, "[t]he Constitution does not mandate a specific method by which the government must satisfy its burden under heightened judicial scrutiny." United States v. Carter, 669 F.3d 411, 418 (4th Cir. 2012). As the Supreme Court has explained, the "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 391 (2000). The Court has upheld restrictions on speech, even under a strict scrutiny standard of review, in some cases relying "solely on history, consensus, and 'simple common sense.'" Florida Bar v. Went For It, Inc., 515 U.S. 618, 628 (1995) (citations omitted); see also Milavetz, Gallop & Milavetz v. United States, 130 S. Ct. 1324, 1340 (2010) (rejecting notion that government must adduce evidence to justify restriction on speech and

noting "[w]hen the possibility of deception is as self-evident as it is in this case, we need not require the State to conduct a survey of the public before it may determine that the advertisement had a tendency to mislead") (internal alterations and citations omitted).  The Corps regulation must only satisfy this intermediate level of scrutiny and, as set forth below, it does so.

### 2.     The Fit Between the Regulation and the Corps' Important Objectives Satisfies Heightened Review.

Here, the Corps undoubtedly has an important – indeed, compelling – interest in promoting public safety on the land it manages, and in protecting visitors from the risk of firearm violence.  The Supreme Court has stated repeatedly that "the government's interest in preventing crime . . . is both legitimate and compelling."  United States v. Salerno, 481 U.S. 739, 749 (1987) (citation omitted); see also Schall v. Martin, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.") (citations and quotation marks omitted).  The Fourth Circuit has made clear that the government has a substantial, even compelling, interest in "providing for the safety of individuals who visit and make use of the national parks," which include "area[s] where large numbers of people, including children, congregate for recreation."  Masciandaro, 638 F.3d at 473.  The same is true with respect to recreational areas on Corps-managed lands.

Moreover, the Corps' justification for this regulation is neither novel nor implausible.  As explained above, see supra III.A, the Corps has developed rules governing visitors' access to Corps-managed lands that are designed to resolve potential sources of conflict among the large numbers of visitors who recreate on these lands.  The Corps has reasonably determined that the presence of a loaded firearm has the potential to escalate tensions resulting from disagreements among visitors to the level of a substantial threat to public safety, involving the potential use of deadly force against visitors or Corps Park Rangers.  In addition, because Congress has not

22

authorized Corps Park Rangers to carry firearms, the Corps has reasonably concluded that allowing visitors to carry arms on Corps-managed lands could create a chilling effect on Rangers' enforcement of Corps regulations. Thus, in order to fulfill its mission of "manag[ing] the natural, cultural, and developed resources of each project in the public interest, [and] providing the public with safe and healthful recreational opportunities," 36 C.F.R. § 327.1, the Corps regulation restricts the possession of loaded firearms on Corps-administered lands unless the firearms are being carried by a law enforcement officer, by a visitor with permission from the District Commander, or by a visitor using them for hunting or target shooting.

This regulation does not impose novel restrictions; rather, it is similar to other federal statutes and regulations that restrict the carrying of firearms on government property. Under 18 U.S.C. §§ 930(a) and (d)(3), most persons are barred from possessing a "firearm or other dangerous weapon in a Federal facility," except for "lawful carrying of firearms or other dangerous weapons . . . incident to hunting or other lawful purposes." Similar to 18 U.S.C. § 930, the Corps regulation permits the carrying of firearms incident to hunting or fishing (including permitting the carrying of unloaded firearms when being transported to, from, or between hunting and fishing sites). 36 C.F.R. § 327.13(a)(2). Section 930 allows for the prohibition of firearms in any "Federal facility," as well as on the grounds "appurtenant to such building." See 18 U.S.C. § 930(f) ("Nothing in this section limits the power of a court of the United States to punish for contempt or to promulgate rules or orders regulating, restricting, or prohibiting the possession of weapons within any building housing such court or any of its proceedings, or *upon any grounds appurtenant to such building*.") (emphasis added). See, e.g., 32 C.F.R. §§ 1903.1, 1903.10 (Central Intelligence Agency) (prohibiting "[k]nowingly possessing or causing to be present a weapon on an Agency installation," including "incident to

23

hunting or other lawful purposes," defined as "property within the Agency Headquarters

Compound and the property controlled and occupied by the Federal Highway Administration

located immediately adjacent to such Compound, and property within any other Agency

installation and protected property (i.e., property owned, leased, or otherwise controlled by the

Central Intelligence Agency")); 32 C.F.R. §§ 234.1, 234.10 (Department of Defense)

(prohibiting "possessing, carrying, or using" a weapon while on the "Pentagon Reservation,"

defined as "Area of land and improvements thereon . . . includ[ing] all roadways, walkways,

waterways, and all areas designated for the parking of vehicles").[11]

     The Corps regulation is thus similar to other "place" regulations on firearms possession

upheld against Second Amendment challenges, including by courts in this Circuit.  See Warden,

697 F. Supp. 2d at 1224, 1228-30 (upholding against state constitutional challenge rule

prohibiting carrying concealed or openly displaying firearms in parks facilities in Seattle where

children are likely to be present); Young, 911 F. Supp. 2d at 990 ("Unlike the law held

unconstitutional in McDonald, 130 S. Ct. 3020, which operated as a complete ban, or Ezell [v.

City of Chicago, 651 F.3d 684 (7th Cir. 2011)], which burdened gun ownership for self-defense

in the home, Hawaii's Firearm Carrying Laws allow firearms to be carried in public between

specified locations or with a showing of special need.").

---

[11] See also 31 C.F.R. § 407.13 (Department of Treasury) ("No person while on the property shall carry firearms, or other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes."); 38 C.F.R. § 1.218(a)(13) (Department of Veterans Affairs) ("No person while on property shall carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes."); 36 C.F.R. § 504.14 (Smithsonian Institution Building and Grounds) ("No person while on the premises shall carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, except for official purposes.").  Additionally, civilians who are legally authorized to possess a firearm when visiting certain Army facilities for recreational hunting and target shooting must carry the firearm unloaded, and not concealed, except when they are actually engaged in hunting or target shooting.  See 32 C.F.R. §§ 552.103 (Fort Stewart, Georgia), 552.129 (Fort Gordon, Georgia).

For these reasons, the Corps regulation relates substantially to the government's important objectives and therefore satisfies the requirements of intermediate scrutiny analysis.

## IV.    Any Permanent Relief Awarded Should Apply Only to the Two Named Plaintiffs.

Finally, even if the Court were to disagree with the Corps, the only proper relief would be to preclude the Corps from applying the challenged regulation to the two plaintiffs in this case. See Stormans, Inc. v. Selecky, 586 F.3d 1109, 1140 (9th Cir. 2009) ("Injunctive relief . . . must be tailored to remedy the specific harm alleged.").

Absent a recognized exception, "litigation is conducted by and on behalf of the individual named parties only." Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979).  Injunctive relief entered in an individual case "should [thus] be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." Id. at 702; see also Monsanto v. Geertson Seed Farms, 130 S. Ct. 2743, 2761 (2010) (invalidating nationwide injunction where less burdensome remedy was available to redress parties' harm).  "This rule applies with special force where there is no class certification." Los Angeles Haven Hospice v. Sebelius, 638 F.3d 644, 664 (9th Cir. 2011); see also Zepeda v. INS, 753 F.2d 719, 727-730 & n.1 (9th Cir. 1984) (holding that, in the absence of class certification, preliminary injunctive relief may cover only the named plaintiffs); Nat'l Ctr. for Immigrants Rights v. INS, 743 F.2d 1365, 1371-72 (9th Cir. 1984) (same).  "This limitation is consistent with the traditional rule that injunctive relief should be narrowly tailored to remedy the specific harms shown by plaintiffs, rather than to enjoin all possible breaches of the law." Zepeda, 753 F.2d at 728 n.1.

"[W]here large public interests are concerned, and the issuance of an injunction may seriously embarrass the accomplishment of important governmental ends, a court of equity acts with caution and *only upon clear showing that its intervention is necessary in order to prevent an*

*irreparable injury*." Hurley v. Kincaid, 285 U.S. 95, 104 n.3 (1932) (emphasis added).  The two individual plaintiffs have not demonstrated that anything other than permanent relief directed to them is necessary to remedy their alleged injuries.

Moreover, even decisions that have found laws and regulations to be inconsistent with the Second Amendment's protections have limited the scope of their relief to the individual plaintiffs and specific location at issue in the action or delayed their relief to allow for corrective action. See Bonidy, No. 10-2408, 2013 WL 3448130, at *6-7 (invalidating Postal Service regulation in response to Second Amendment challenge, but only ordering the Postal Service to "take such action as is necessary to permit Tab Bonidy to use the public parking lot adjacent to the Avon[, Colorado] Post Office Building with a firearm authorized by his Concealed Carry Permit secured in his car in a reasonably prescribed manner" and denying all other claims that the Postal Service regulation was unconstitutional); Moore, 702 F.3d at 942 (invalidating Illinois statute against Second Amendment challenge, but staying mandate for 180 days to allow the state legislature to craft a more narrow restriction).

In short, even if the Court were to grant permanent relief in this case, binding case law establishes that any such relief should extend no further than necessary to place the two named plaintiffs in their allegedly rightful positions.

## CONCLUSION

Because the Corps regulation is a "presumptively lawful" prohibition on "the carrying of firearms in sensitive places," as described in Heller, 554 U.S. at 626, it does not preclude conduct that is protected by the Second Amendment.  In any event, the Corps regulation would pass muster under any level of constitutional scrutiny.  The Court should thus enter summary judgment for Defendants.

26

Dated:  May 19, 2014                      Respectfully submitted,


                                          STUART F. DELERY
                                          Assistant Attorney General

                                          WENDY J. OLSON
                                          United States Attorney

                                          JOANNE RODRIGUEZ
                                          Assistant United States Attorney

                                           /s/ Daniel Riess
                                          DIANE KELLEHER
                                          Assistant Branch Director
                                          DANIEL RIESS
                                          Trial Attorney
                                          U.S. Department of Justice
                                          Civil Division, Rm. 6122
                                          20 Massachusetts Avenue, NW
                                          Washington, D.C. 20530
                                          Telephone: (202) 353-3098
                                          Fax: (202) 616-8460
                                          Email: Daniel.Riess@usdoj.gov
                                          *Attorneys for Defendants*