# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

GEORGIACARRY.ORG, INC.,
and DAVID JAMES,

     Plaintiffs,

v.

THE U.S. ARMY CORPS OF
ENGINEERS, and JOHN J.
CHYTKA, in his official capacity
as Commander, Mobile District of
the U.S. Army Corps of Engineers

     Defendant.

CIVIL ACTION FILE
NO. 4:14-CV-00139-HLM

## ORDER

This case is before the Court on Plaintiffs' Motion for

Preliminary Injunction [5].

AO 72A

(Rev.8/8
2)

# I. Background

## A. Procedural Background

On June 12, 2014, Plaintiffs filed the instant Complaint seeking the Court's declaration that 36 C.F.R. § 327.13 (the "Firearms Regulation"), a regulation restricting gun use on Defendant Army Corps of Engineers' ("Defendant Army Corps") property, violates the Second Amendment of the United States Constitution. (Docket Entry No. 1.) In the Complaint, Plaintiffs requested a preliminary injunction prohibiting  enforcement of the Firearms Regulation. (Compl. (Docket Entry No. 1) ¶ 37.) The Court instructed Plaintiffs to file a separate brief requesting injunctive relief (Docket Entry No. 4), and Plaintiffs filed  such a brief on June 13, 2014 (Docket Entry No. 5). After receiving an

extension (Docket Entry No. 9), Defendants filed their response on July 14, 2014 (Docket Entry No. 11). Plaintiffs have now replied (Docket Entry No. 15), and the Court consequently finds the instant Motion ripe for resolution.

## B. Plaintiffs' Allegations

Plaintiff GeorgiaCarry.Org ("Plaintiff GCO") is a non-profit corporation organized under Georgia law. (Compl. ¶ 4.) Its mission is to support its member's rights to keep and bear arms. (Id. ¶ 5.) Plaintiff David James ("Plaintiff James") is a resident of Paulding County, Georgia, and a member of Plaintiff GCO. (Id. ¶¶ 6-7.) Defendant Army Corps is a subset of the United States Army. (Id. ¶ 8.) Defendant Army Corps operates public parks and recreational facilities at water resource development projects under control of the

3

Department of the Army. (Id. ¶ 9.) Plaintiffs allege that Defendant Army Corps "is the largest provider of water-based outdoor recreation in the United States." (Id. ¶ 10.) Defendant Chytka is the Commander of the Mobile District of Defendant Army Corps, and is sued in his official capacity only. (Id. ¶¶ 11-12.) The Mobile District of Defendant Army Corps operates projects and facilities on the Apalachicola, Chattahoochee, and Flint rivers. (Id. ¶ 13.)

Plaintiff James possesses a Georgia weapons carry license issued pursuant to O.C.G.A. § 16-11-129. (Compl. ¶ 14.) In Georiga, such licenses are generally required to carry a gun outside of one's home, automobile or place of business. (Id. ¶ 15.) Plaintiff James regularly carries a handgun in case of confrontation, except in locations where

4

doing so is prohibited by law. (<u>Id.</u> ¶ 16.) Plaintiff James, along with other members of Plaintiff GCO, regularly camps and recreates on property owned by Defendant Army Corps at Lake Allatoona (the "Allatoona Property"), a Defendant Army Corps water facility located in northwest Georgia. (<u>Id.</u> ¶¶ 17-18, 33.) The Allatoona Property lies in Defendant Army Corps' Mobile District, and is therefore subject to Defendant Chytka's command. (<u>Id.</u> ¶ 19.) The Allatoona Property is one of Defendant Army Corps' most visited properties, receiving over six million visitors per year. (<u>Id.</u> ¶¶ 20-21.) There are nearly six hundred campsites and two hundred picnic sites on the Allatoona Property, and Plaintiff James camps in a tent on one of those sites several weeks per year. (<u>Id.</u> ¶ 22.)

AO 72A

(Rev.8/8
2)

Defendant Army Corps' Firearms Regulation prohibits the possession of firearms on Corps property, absent certain exceptions. (Compl. ¶ 23.) It states, in full:

(a) The possession of loaded firearms, ammunition, loaded projectile firing devices, bows and arrows, crossbows, or other weapons is prohibited unless:

(1) In the possession of a Federal, state or local law enforcement officer;

(2) Being used for hunting or fishing as permitted under § 327.8, with devices being unloaded when transported to, from or between hunting and fishing sites;

(3) Being used at authorized shooting ranges; or

(4) Written permission has been received from the District Commander.

(b) Possession of explosives or explosive devices of any kind, including fireworks or other pyrotechnics, is prohibited unless written permission has been received from the District Commander.

6

AO 72A

(Rev.8/8
2)

36 C.F.R. § 327.13. Violation of the Firearms Regulation is punishable by a fine of up to $5,000.00, six months imprisonment, or both. (Compl. ¶ 27; 36 C.F.R. § 327.25.)

Plaintiffs state that "[b]ut for the application and enforcement of [the Firearms Regulation], [Plaintiff] James would keep and carry a handgun in case of confrontation when he recreates and camps at Allatoona." (Compl. ¶ 26.) Further, Plaintiff James "is in fear of arrest, prosectuion and punishment for violating [the Firearms Regulation] and therefore refrains from keeping and carrying a handgun when he recreates and camps at Allatoona." (Id. ¶ 29.) Plaintiff James requested that he be granted written permission to carry a handgun pursuant to section (a)(4) of the firearms regulation. (Id. ¶¶ 30-31.) However, on June 9,

7

2014, Defendant Chytka informed Plaintiff James that he had "discerned not to exercise [his] discretion under [the Firearms Regulation] to grant [Plaintiff James] permission to possess a loaded firearm while visiting Lake Allatoona." (Id. ¶ 32.) Based on this denial, Plaintiffs assert that Defendants are violating the Second Amendment rights of Plaintiff James. (Id. ¶¶ 34-35.) Plaintiffs request a declaration that the Firearms Regulation is unconstitutional on its face and as applied (id. ¶ 36), a preliminary and permanent injunction prohibiting enforcement of the Firearms Regulation (id. ¶ 37), costs for bringing and maintaining this case (id. ¶ 38), and any other relief the Court deems proper (id. ¶ 39).

8

## II.    Preliminary Injunction Standard

To obtain a temporary restraining order or preliminary injunction, a movant must show: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury unless the injunction is issued; (3) that the threatened injury outweighs the harm the temporary restraining order would inflict on the non-movant; and (4) that the temporary restraining order would not be adverse to the public interest. LSSI Data Corp. v. Comcast Phone, LLC, 696 F.3d 1114, 1119 (11th Cir. 2012). "[A] [temporary restraining order or preliminary injunction] is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites." SunTrust Bank v. Houghton Mifflin Co., 252

9

F.3d 1165, 1166 (11th Cir. 2001) (per curiam) (citation omitted).

## III. Discussion

### A. Likelihood of Success on the Merits[1]

#### 1. Collateral Estoppel

Plaintiffs argue that Defendant Army Corps is collaterally estopped from re-litigating the issues in this cased based on an Idaho District Court's January 10, 2014, order granting an injunction against Defendant Army Corps' enforcement of the Firearms Regulation. (See Br. Supp.

---

[1]Though not raised by the Parties, as a threshold issue, the Court notes that Plaintiffs have standing to challenge the Firearms Regulation because "Plaintiffs are seriously interested in engaging in conduct that is arguably prohibited by the [Firearms Regulation] and that could give rise to prosecution by [federal] authorities." See GeorgiaCarry.Org v. Georgia, 687 F.3d 1244, 1252-53 (11th Cir. 2012).

10

AO 72A
(Rev.8/8
2)

Prelim. Inj. (Docket Entry No. 5-1) at 3-4 citing Morris v. U.S. Army Corps of Eng'rs, 990 F. Supp. 2d 1082 (D. Idaho Jan. 10, 2014).) This argument fails for two reasons.

First, the order Plaintiffs rely upon is an order granting a preliminary injunction, not a final order on the merits. See Morris, 990 F. Supp. 2d at 1089. However, "[f]inality is an essential element of both res judicata and collateral estoppel." In re Bayshore Ford Trucks Sales, Inc., 471 F.3d 1233, 1253 (11th Cir. 2006); see also Medtronic, Inc. v. Gibbons, 684 F.2d 565, 569 (8th Cir. 1982) ("[T]he doctrine of collateral estoppel requires a prior final judgment; the granting or denial of a preliminary injunction is generally not based on a final decision on the merits and is not a final judgment for the purposes of collateral estoppel."). This lack

11

AO 72A
(Rev.8/8
2)

of finality alone precludes any application of collateral estoppel in this case.

Second, whether the <u>Morris</u> order was final or not, it is a well founded legal principle that the government cannot be subjected to offensive collateral estoppel. <u>See United States v. Mendoza</u>, 464 U.S. 154, 155 (1984) ("We hold that the United States may not be collaterally estopped on an issue . . . adjudicated against it in an earlier lawsuit brought by a different party."). Indeed, the policy reasons espoused by the United States Supreme Court in its decision banning the use of nonmutual offensive collateral estoppel against the government applies directly to this case. That court wrote that "[a] rule allowing nonmutual collateral estoppel against the government . . . would substantially thwart the

12

development of important questions of law by freezing the first final decision rendered on a particular legal issue. Allowing only one final adjudication would deprive [the Supreme Court] of the benefit it receives from permitting several courts of appeals to explore a difficult question before [the Supreme Court] grants certiorari." Id. at 160. For both these reasons, Plaintiffs' collateral estoppel argument fails and cannot be the basis for a preliminary injunction against enforcement of the Firearms Regulation.

## 2. Violation of Plaintiffs' Second Amendment Rights

The Supreme Court's 2008 decision in District of Columbia v. Heller made clear that the Second Amendment encompasses an individual right to keep and bear arms.[2]

---

[2]The case of McDonald v. City of Chicago, Ill. ruled that the

13

See District of Columbia v. Heller, 554 U.S. 570, 635 (2008)

("[The Second Amendment] elevates above all other

interests the right of law-abiding, responsible citizens to use

arms in defense of hearth and home."). Further, Heller left

little doubt that laws banning "handgun possession in the

home" are in violation of the Second Amendment. (Id.)

However, the extent to which the Second Amendment

protects individuals seeking to carry firearms outside the

home, and the framework in which courts are to evaluate

laws regulating firearm possession, remains unclear. See id.

at 718 (Breyer, J., dissenting) ("The [majority] decision will

---

Fourteenth Amendment made the Second Amendment applicable
to the states; however, no state laws are at issue in the instant
case. See McDonald v. City of Chicago, Ill., 130 S.Ct. 3020, 3050
(2010) ("[T]he Due Process Clause of the Fourteenth Amendment
incorporates the Second Amendment right recognized in Heller.").

14

encourage legal challenges to gun regulation throughout the Nation. Because it says little about standards used to evaluate regulatory decisions, it will leave the Nation without clear standards for resolving those challenges.").

Despite this lack of guidance from the Supreme Court, the Eleventh Circuit, along with most other circuits to address the issue, has adopted a two step approach to evaluating Second Amendment challenges. <u>See</u> <u>GeorgiaCarry.Org</u>, 687 F.3d at 1261 n.34 ("Like our sister circuits, we believe a two-step inquiry is appropriate: first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we would apply the appropriate level of scrutiny."); <u>see also</u> <u>Ezell v. City of Chicago</u>, 651 F.3d 684, 700-704 (7th Cir.

AO 72A
(Rev.8/8
2)

2011) (applying two step framework); <u>Jackson v. City &</u>
<u>Cnty. of San Francisco</u>, 746 F.3d 953, 960 (9th Cir. 2014)
("Like the majority of our sister circuits, we have discerned
from <u>Heller</u>'s approach a two-step Second Amendment
inquiry."). "First, the threshold inquiry in some Second
Amendment cases will be a 'scope' question: Is the
restricted activity protected by the Second Amendment in
the first place?" <u>Ezell</u> 651 F.3d at 701. Second, if the
regulated activity is not categorically unprotected, "there
must be a second inquiry into the strength of the
government's justification for restricting or regulating the
exercise of Second Amendment rights." <u>Id.</u> at 703. The
scrutiny applied "will depend on how close the law comes to
the core of the Second Amendment right and the severity of

16

AO 72A
(Rev.8/8
2)

the law's burden on the right." Id. The Court applies this framework below.[3]

### a. The Firearms Regulation Does Not Burden a Pre-existing Right

To determine whether the Firearms Regulation burdens a pre-existing right, courts are instructed to make "a textual and historical inquiry into original meaning." Ezell 651 F.3d at 701. In other words, the framework adopted by the

---

[3]Though the Complaint requests a declaration that the Firearms Regulation is "unconstitutional on its face and as applied" (Compl. ¶ 36), Plaintiffs' Brief Supporting their Motion for Preliminary Injunction makes no distinction between the two requests, (see generally Br. Supp. Prelim. Inj.). However, the Court addresses the challenges as being of the "as-applied" variety. Plaintiffs do not address what constitutional problems would have arisen had Defendant Chytka granted Plaintiff James permission to carry pursuant to section (a)(4) of the Firearms Regulation, instead focusing only on the individualized set of facts at hand. Consequently, Plaintiffs do not attempt to "establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987).

country's appellate courts requires this Court to determine whether, in 1791, there was a widely accepted right to carry firearms on Defendant Army Corps' property.[4] See Heller, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth

---

[4]Admittedly, given the paucity of appellate court opinions on the issue at this time, it is difficult, if not impossible, for a district court faced with an emergency motion for preliminary injunction to evaluate the contours of Second Amendment rights in colonial America. Indeed, the Court in Morris, a case heavily relied upon by Plaintiffs, appears to skip this step and instead holds that the Second Amendment encompasses a right to carry firearms everywhere, so long as the bearer is carrying the weapons for "self-defense purposes." See Morris, 990 F. Sup. 2d at 1085-86, at *2 (finding that "[Defendant Army] Corps' regulation burdens conduct protected by the Second Amendment [because] [t]he Second Amendment protects the right to carry a firearm for self-defense purposes"). Respectfully, this Court finds that the pre-existing right encompassed by the Second Amendment was not free from locational restrictions. See Heller, 554 U.S. at 626 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). The Court addresses such limitations in the context of Defendant Army Corps' property below.

AO 72A

(Rev.8/8
2)

Amendments, codified a pre-existing right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" (emphasis omitted).) For the following reasons, the Court finds it highly unlikely that any such right existed.

"When Congress organized the Continental Army on June 16, 1775, it provided for a Chief Engineer and two assistants with the Grand Army and a Chief Engineer and two assistants in a separate department, should one be established." U.S. Army Corps of Engineers Office of History, The U.S. Army Corps of Engigneers: A History 1 (2008) (hereinafter, "Army Corps History"). During the revolutionary war, "Engineer officers reconnoitered enemy

19

AO 72A
(Rev.8/8
2)

positions and probable battlefields, wrote useful reports based on their observations, oversaw the construction of fortifications, and drew detailed maps for commanders." Id. at 2. In the years following the Revolutionary War, there was much debate in the country about the necessity of a large standing army, and the use of engineering corps was limited to temporary assignments to upgrade old coastal fortifications and occasionally to build new ones. Id. at 7. However, "[o]n March 16, 1802, Congress permanently established a separate U.S. Army Corps of Engineers and the U.S. Military Academy at West Point as the Nation's first engineering school." Id. at 8.

During the War of 1812, "the engineers performed many of the same tasks they had in the Revolution,

20

including constructing fortifications, reconnoitering and mapping, and assisting the movement of armies." Army Corps History at 12. However, "fortifications were the primary concern of the engineers during the War of 1812, as they had been earlier." Id.

Though primarily concerned with defense related projects, Defendant Army Corps' role began to encompass civil works at an early stage in its history. For example, in 1800, "Secretary of War James McHenry . . . suggested that engineer officers possess talents that serve the country not only in war, but also in peacetime 'works of a civil nature.'" Army Corps History at 241. However, it was still clear that Defendant Army Corps was, first and foremost, a branch of the United States military. For example, "[m]ail intended for

21

the Chief Engineer was sent under cover to the Secretary of War with the words 'Engineer Department' written on the lower left-hand corner of the envelope." Id. Oversight of Defendant Army Corps was also entrusted to the cabinet official overseeing the United States Army. Id. Finally, many congressional acts mandating that Defendant Army Corps carry out civil works activities "explicitly mandated that the Secretary of War supervise the expenditure of appropriated funds." Id. at 243.

Much like the firearms that were initially protected by the second amendment have evolved over the years, the role of Defendant Army Corps has changed to suit the country's needs. For example, it may have been hard for the framers to comprehend a wilderness "recreational

AO 72A
(Rev.8/8
2)

facility" at all, much less one owned and operated by the federal government. Nonetheless, the Flood Control Act of 1944 authorized Defendant Army Corps to "construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of the Army." 16 U.S.C. § 460d.

However, despite this evolution, Defendant Army Corps is still an integral part of the United States Armed Forces. See 10 U.S.C. § 3063(a)(4) ("The Secretary of the Army may assign members of the Army to its basic branches. The basic branches [include] . . . [the] Corps of Engineers."). Though much of Defendant Army Corps' modern day work is on civil projects, those projects, including the flood control project that led to the creation of Lake Allatoona, are

23

regularly overseen by the Secretary of the Army. See 33 U.S.C. § 701b ("Federal investigations and improvements of rivers and other waterways for flood control and allied purposes shall be under the jurisdiction of and shall be prosecuted by the Department of the Army under the direction of the Secretary of the Army and supervision of the Chief of Engineers.").

Finally, it cannot be overlooked that the existence of Defendant Army Corps' "recreational facilities" is merely a byproduct of the sensitive dam construction projects nearby. (See Decl. of Stephen B. Austin (Docket Entry No. 11-1) ¶ 9 ("[T]he majority of [Defendnant Army] Corps facilities have multiple congressionally-authorized purposes, including navigation, flood control or damage reduction, and water

24

supply. Recreation is never the sole purpose of a [Defendant Army] Corps-managed Water Resources Development Project.").)   These dams and other infrastructure works, just like the fortifications built by Defendant Army Corps during the founding era of our country, are vitally important to our national security and well being. (See id. ("Both [Defendant Army] Corps and the U.S. Department of Homeland Security have identified certain [Defendant Army] Corps-managed infrastructure as critical to homeland security and the economy.").) Simply put, the Court cannot fathom that the framers of the Constitution would have recognized a civilian's right to carry firearms on property owned and operated by the United States Military, especially when such property contained

25

infrastructure products central to our national security and well being.

Turning to the relatively small amount of Second Amendment case law that has wound its way through the country's courts following <u>Heller</u>, this Court can find no decisions suggestive of a right to carry firearms on Defendant Army Corps' property. As discussed above, the <u>Heller</u> court declined to address what degree of constitutional protection firearm possession outside the home is afforded. However, the <u>Heller</u> court acknowledged that the restriction of firearm possession in certain locations did not burden any pre-existing rights. The court wrote that "[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment

26

AO 72A
(Rev.8/8
2)

. . . nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." <u>Heller</u>, 554 U.S. at 626. Though Defendant Army Corps' property is more expansive than just a "building," there is no reason to doubt that the Firearms Regulation, which restricts the use of firearms on military property nearby sensitive infrastructure projects, does not fall squarely into the existing "laws forbidding the carrying of firearms in sensitive places" referenced in <u>Heller</u>. <u>Id.</u>

Further, though the Eleventh Circuit has issued only one post-<u>Heller</u> opinion addressing the right of law abiding citizens to carry firearms outside their homes, it is not contrary to, and in certain respects supports, the Court's

27

finding today. In <u>GeorgiaCarry.Org v. Georgia</u>, Plaintiff GCO sued the State of Georgia and several Georgia state government officials challenging a law that prevented licensed gun holders from carrying firearms in "places of worship" unless they received permission from security or management personnel of the church. <u>GeorgiaCarry.Org</u>, 687 F.3d at 1248-49. The court found that no pre-existing right to carry firearms on the property of others existed, so the law did not infringe upon Second Amendment rights and no constitutional scrutiny need be applied. <u>Id.</u> at 1266.

The <u>GeorgiaCarry.Org</u> holding is of course  not a perfect comparison to the instant situation. It concerned the rights of private property owners, namely places of worship, to keep firearms off of their privately owned property. <u>See</u>

28

GeorgiaCarry.Org 687 F.3d at 1264 ("Quite simply, there is no constitutional infirmity when a private property owner exercises his, her, or its . . . right to control who may enter, and whether that invited guest can be armed."). However, while Defendant Army Corps is not a private property owner, in contrast to many examples of publicly held lands, there is little doubt that Defendant Army Corps could exclude civilians from its property altogether. See United States v. Jelinski, 411 F.2d 476, 478 (5th Cir. 1969)[5] ("We do not doubt the Commander's historically recognized authority to summarily bar civilians from a military establishment in the exercise of his discretion in managing

---

[5]Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).

29

the internal operations of the military facility."); see also 16 U.S.C. § 460d (stating that Defendant Army Corps is "authorized" to maintain recreational facilities, but including no requirement that it do so). Under those circumstances, the Eleventh Circuit's proclamation that private property owners may exclude guns from their property is relevant to the case at hand. It would be an awkward holding to find that, though Defendant Army Corps may exclude civilians from its property altogether, if it chooses to allow them access, it must also allow them to carry firearms.[6] Indeed,

---

[6]The same can be said of the Morris court's position that placing a tent on Defendant Army Corps property makes such property more like a "home" and brings the regulation within the scope of Heller. See Morris, 990 F. Supp. 2d at 1085-86. Unlike private property or national park property, Plaintiffs have no constitutional or statutory right to pitch a tent in the first place. To hold that Defendant Army Corps' decision to allow civilians to erect tents on their property means that Defendant Army Corps must also

30

it is not hard to see how the end result of an order from this Court requiring Defendant Army Corps to allow the use of firearms for self defense on its property could result in the limitation of access to Defendant Army Corps property for all citizens, whether they are attempting to carry firearms or not.

The Court is aware that the right to carry firearms for self defense purposes is central to the Second Amendment. See McDonald, 130 S.Ct. at 3036 ("[S]elf-defense is 'the central component' of the Second Amendment right." (emphasis omitted)). However, the Court cannot find that the Firearms Regulation infringes on Plaintiffs' constitutionally enshrined right to defend themselves. The

---

allow firearms in those tents would be irrational.

31

only contours that the Supreme Court gave to this right to self defense is that citizens have a right to bear arms for self defense within the home. See id. at 3044 ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."). The Firearms Regulation does not infringe on that right.

Further, while some lower courts have expanded on that limited right, such cases are inapplicable here. For example, Plaintiffs cite to two Seventh Circuit cases striking down laws as violative of the Second Amendment: Ezell v. City of Chicago and Moore v. Madigan. (See Br. Supp. Mot. Compel at 7.) In Ezell, a Chicago law banned residents from possessing firearms, even in the home, without first

32

completing at least "one hour of [firing] range training." Ezell, 651 F.3d at 691. However, that same law "banned [firing ranges] throughout the city." Id. Consequently, though the Ezell Plaintiffs were technically challenging Chicago's ban on firing ranges, that ban also burdened Chicago residents' ability to possess firearms in their homes. No such burden is at issue with the instant Firearms Regulation. See, e.g., Young v. Hawaii, 911 F. Supp. 2d 972, 990 (D. Haw. Nov. 29, 2012) ("Unlike the law held unconstitutional in McDonald, which operated as a complete ban, or Ezell, which burdened gun ownership for self-defense in the home, Hawaii's Firearm Carrying Laws allow firearms to be carried in public between specified locations or with a showing of special need. Plaintiff does

33

not allege a constitutional violation because the right to bear arms does not include the right to carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (internal quotation marks and citations omitted)).

In <u>Moore</u>, the Seventh Circuit evaluated an Illinois law that essentially banned the possession of loaded firearms outside the home altogether. <u>See Moore</u>, 702 F.3d at 936. The Court found that right to self defense espoused in <u>Heller</u> and <u>McDonald</u> necessarily included some right to bear arms outside ones home. <u>See id.</u> at 937 ("To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in <u>Heller</u> and <u>McDonald</u>."). In the words of Judge Posner, limiting the right to bear arms to ones home would do little

34

to protect the right to self defense, as "a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower." Id.

Certainly, Judge Posner's statement is true, and the Court does not address whether carrying firearms outside the home is protected under certain circumstances. Nonetheless, Judge Posner's proclamation bears little bearing on the instant facts. Unlike city streets, or even public schools, post offices, and other government properties, Defendant Army Corps has the right to exclude Plaintiffs from its property altogether, and Plaintiffs can ensure no harm befalls them on Defendant Army Corps

35

property by simply choosing to recreate elsewhere.[7] Indeed,
courts have found carry restrictions on properties far more
integral to citizens' everyday lives to fall outside the scope
of the Second Amendment. <u>See, e.g., Young</u>, 911 F. Supp.
2d at 989-90 (finding that Hawaii laws banning firearm
possession outside the home without application for a
permit based on an exceptional showing of fear or injury "to
the applicant's person or property"); <u>Kachalsky v. Cacace</u>,
817 F. Supp. 2d 235, 240, 264 (S.D.N.Y. Sept. 2, 2011)

---

[7]In the Fourth Amendment context, the Supreme Court has
held that what may ordinarily be a constitutional incursion falls
outside an individual's constitutional rights when such incursion is
the result of an individual's voluntary actions. <u>See, e.g., Wyman v.
James</u>, 400 U.S. 309, 317-18 (1971) (finding that requiring welfare
recipients to allow social workers into their homes in order to
receive aid did not violate fourth amendment rights because "the
visitation in itself is not forced or compelled, and [] the beneficiary's
denial of permission is not a criminal act. If consent to the visitation
is withheld, no visitation takes place. The aid then never begins or
merely ceases, as the case may be . . .").)

36

(finding that a New York law banning handgun possession outside of the home without a showing of "a special need for self-protection distinguishable from that of the general community" fell outside the scope of the Second Amendment), aff'd 701 F.3d 81 (2d Cir. 2012); Digiacinto v. Rector & Visitors of George Mason Univ., 704 S.E.2d 365, 370, 281 Va. 127, 137 (Va. 2011) (finding that almost total ban of firearm possession on university campus did not violate second amendment); United States v. Dorsan, 350 Fed. App'x 874, 875-76 (5th Cir. 2009) (per curiam) (finding that a firearms ban in post office parking lots fell outside the scope of the Second Amendment). Consequently, the Firearms Regulation does not burden Plaintiffs' right to carry a firearm in self defense.

For all the above reasons, the Court finds that the conduct regulated by the Firearms Regulation falls outside the scope of the Second Amendment. Consequently, no further evaluation of the Firearms Regulation need occur. Nonetheless, out of an abundance of caution, the Court proceeds to consider the regulation's ability withstand constitutional scrutiny.

### b. The Firearms Regulation Withstands Appropriate Constitutional Scrutiny

As discussed above, the Court finds that the Firearms Regulation does not burden rights protected by Second Amendment, and therefore falls outside its scope. Nonetheless, the Court is mindful that, though the Second Amendment was drafted almost two and a quarter centuries ago, litigation over its meaning, and the resulting case law,

38

AO 72A
(Rev.8/8
2)

is still in its infancy. Indeed, as pointed out by Defendants, another district court faced with the same question found that the Firearms Regulation burdened Second Amendment rights. See Morris, 990 F. Supp. 2d at 1085 ("The Court must ask first whether [Defendant Army] Corps' regulation burdens conduct protected by the Second Amendment. It does."). Consequently the Court proceeds to determine the appropriate level scrutiny and apply it to this case under the assumption that the Firearms Regulation treads upon Second Amendment protections.

### i.     Intermediate    Scrutiny    Would Apply

Though the Heller court declined to determine the appropriate level of scrutiny to apply to Second Amendment based challenges, it did take rational-basis scrutiny off the

39

table. See Heller, 554 U.S. at 629 n.27 ("[Rational-basis scrutiny] could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms."). This leaves the Court to choose between strict scrutiny, which requires that a law be narrowly tailored to serve a compelling government interest, see Abrams v. Johnson, 521 U.S. 74, 91 (1997), and intermediate scrutiny, which requires a law to be substantially related to an important governmental interest, see Clark v. Jeter, 486

40

AO 72A
(Rev.8/8
2)

U.S. 456, 461 (1988).[8] For the following reasons, the Court

finds that the intermediate scrutiny standard applies here.

First, the Court finds that the lowest possible level of

scrutiny applies because Defendant Army Corps' issuance

of the Firearms Regulation was not an act of governance--it

was a managerial action affecting only government owned

lands. The Supreme Court has "long held the view that

there is a crucial difference, with respect to constitutional

analysis, between the government exercising 'the power to

regulate or license, as a lawmaker,' and the government

---

[8]The Supreme Court has also used an "undue burden" test in
the context of laws limiting access to abortions. See, e.g., Planned
Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 877 (1992).
However, the Court finds such a standard, which provides that a
law is permissible as long as it does not have the "purpose or effect
of placing a substantial obstacle in the path" of the individual
seeking to engage in constitutionally protected conduct, best left to
the abortion cases from which it stemmed. Id.

41

acting 'as proprietor, to manage [its] internal operation.'"
Engquist v. Oregon Dept. of Agr., 553 U.S. 591, 598 (2008)
(quoting Cafeteria & Restaurant Workers v. McElroy, 367
U.S. 886, 896 (1961)) (alterations in original). Indeed, the
Ninth Circuit used this government property rationale to
uphold a law stating that "[e]very person who brings onto or
possesses on County property a firearm, loaded or
unloaded, or ammunition for a firearm is guilty of a
misdemeanor." Nordyke v. King, 681 F.3d 1041, 1044 (9th
Cir. 2012); see also United States v. Masciandaro, 638 F.3d
458, 473 (4th Cir. 2011) (upholding restrictions on firearms
in national parks based, in part, the rule that "[t]he
government . . . is invested with 'plenary power' to protect
the public from danger on federal lands under the Property

42

Clause"). The respect courts must pay to government decisions concerning the management of its own lands only increases when the land in question is military property. See Jelinski, 411 F.2d at 478 (finding that military base commander "was not required to afford notice and a hearing to appellant prior to barring him from the base").

Second, the voluntary nature of Plaintiffs' presence on Defendant Army Corps property limits the extent to which Plaintiffs' Second Amendment rights are burdened by the Firearms Regulation. As the Moore Court wrote: "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a

43

need." <u>Moore</u>, 702 F.3d at 940; <u>see also</u> <u>Jackson v. City &</u>
<u>Cnty. of San Francisco</u>, 746 F.3d 953, 961 (9th Cir. 2014)
(applying to Second Amendment case the First Amendment
principle that "laws that place reasonable restrictions on the
time, place, or manner of protected speech and that leave
open alternative channels for communication of information,
pose less of a [constitutional] burden" (internal quotation
marks and citation omitted)). In other words, unlike most
laws that have been struck down on Second Amendment
grounds, the Firearms Regulation only burdens Plaintiffs'
right to defend themselves on a finite amount of property.
Further, the property in question is not a road, a school, or
a post office that Plaintiffs arguably <u>need</u> to use on a regular
basis. Defendant Army Corps property is merely a collection

44

of recreational campsites. The Court cannot find that any limitation of Plaintiffs' ability to bear arms on those campsites constitutes a serious burden on Plaintiffs' Second Amendment rights.

Consequently, for both of the above reasons, the Court applies intermediate scrutiny to the Firearms Regulation.

### b. The Regulation Withstands Intermediate Scrutiny

In the Second Amendment context, "under intermediate scrutiny the government must assert a significant, substantial, or important interest; there must also be a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary." Drake v. Filko, 724 F.3d 426, 436 (3d Cir. 2013); see also Nat'l Parks

45

Conservation Ass'n v. Norton, 324 F.3d 1229, 1244 (11th Cir. 2003) ("Under [intermediate scrutiny], a preference may be upheld so long as it is substantially related to an important governmental objective." (internal quotation marks and citation omitted)). "When reviewing the constitutionality of statutes, courts 'accord substantial deference to the [legislature's] predictive judgments.'" Drake, 724 F.3d at 436-37 (quoting Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997)) (alteration in original)).

Here, Defendant Army Corps undoubtedly has a substantial interest in "providing the public with safe and healthful recreational opportunities while protecting and enhancing [its] resources." 36 C.F.R. § 327.1. The only question is whether there is a reasonable fit between that

46

AO 72A
(Rev.8/8
2)

interest and the Firearms Regulation. The Court finds that there is.

First, the Firearms Regulation contributes to ensuring that visitors to Defendant Army Corps' property are safe. There is evidence in the record that Defendant Army Corps' facilities "have a high density of use" from a "diverse mixture of visitors with their own lifestyles." (Austin Decl. ¶ 4.) These visitors regularly play loud music, socialize at inconvenient hours, and consume alcohol. (Id.) Such circumstances inevitably lead to conflicts, and the Court cannot find unreasonable Defendant Army Corps conclusion that "[t]he presence of a loaded firearm could far more quickly escalate such tension between visitors from a minor disagreement to a significant threat to public safety." (Id.)

47

AO 72A
(Rev.8/8
2)

Second, the Firearms Regulation is reasonably suited to protecting the infrastructure projects that lie at the heart of Defendant Army Corps' properties. As stated above, "[b]oth [Defendant Army Corps] and the U.S. Department of Homeland Security have identified certain [Defendant Army Corps]-managed infrastructure as critical to homeland security and the economy." (Austin Decl. ¶ 9.) Further, [e]arly detection of threats to [Defendant Army Corps]-managed infrastructure is aided by current [Defendant Army Corps] policy, and could be compromised by an overly permissive firearms policy." (Id.) The Court finds it reasonable for Defendant Army Corps to limit the carrying of loaded firearms around such sensitive areas.

48

Finally, and perhaps most importantly, the limitations on Defendant Army Corps' ability to police its own property make the Firearms Regulations key to achieving its goal of maintaining safe premises for all visitors. Defendant Army Corps' Park Rangers ("Park Rangers") do not carry weapons. (Austin Decl. ¶ 5.) Indeed, Park Rangers could not carry firearms even if they chose to, as Congress has not given them any authorization to carry firearms, execute search warrants, or enforce other federal laws on Defendant Army Corps' property. (Id.) Instead, Park Rangers must call in local law enforcement to handle any serious issues. (Id. ¶ 7.) And, even when local law enforcement is called in, they can only enforce state and local laws, and they are still

49

subject to their other state and local law enforcement demands. (Id.)

The Court is aware that this case is only at the preliminary injunction stage, and as discovery takes place and more evidence comes before the Court, the situation may change. However, at this point, the Court finds it likely that the Firearms Regulations is reasonably suited to advance a substantial government interest.

## B. Irreparable Injury

Plaintiff asserts that irreparable injury exists in this case because an "alleged deprivation of a constitutional right is sufficient to constitute irreparable injury," and "Plaintiffs have not only alleged a deprivation of a constitutional right, but they have shown that they are likely to succeed on the

50

merits in their alleged deprivation." (Br. Supp. Prelim. Inj. at 9 (internal quotation marks and citation omitted).) Further, Plaintiffs contend "that they cannot be financially compensated for their harm, and they are suffering the harm now, and on a continual basis, at the height of the outdoor recreational season in Georgia." (Id.) The Court disagrees with Plaintiffs' position, and finds that there is no evidence of irreparable harm in this case.

The Court does not question that a demonstrated violation of certain constitutional rights satisfies the irreparable harm requirement without any further showing. See, e.g., Cate v. Oldham, 707 F.2d 1176, 1188 (11th Cir. 1983) ("It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes

51

irreparable injury justifying the grant of a preliminary injunction." (internal quotation marks and citation omitted)). But see, e.g., N.E. Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl., 896 F.2d 1283, 1285 (11th Cir. 1990) ("No authority from the Supreme Court or the Eleventh Circuit has been cited to us for the proposition that the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation."). However, the Court need not decide whether the Second Amendment's protections are of the sort that, when violated, trigger a presumption of irreparable harm, as there is no indication here that such a violation has occurred. See supra Part III.A. It is the showing of a likelihood of constitutional deprivation, not merely the

52

allegation of such a depravation, that amounts to irreparable harm. See Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) ("[T]he absence of a substantial likelihood of irreparable injury . . . standing alone, make[s] preliminary injunctive relief improper."). Consequently, because Plaintiffs do not demonstrate a likelihood of constitutional harm in the first place, Plaintiffs fail to demonstrate that irreparable harm will flow from a denial of the instant Motion for Preliminary injunction.

## C.   Balance of Harms and The Public Interest

Plaintiffs also fail to demonstrate that the balance of harms falls in their favor. Even assuming that Plaintiffs eventually do prevail on the merits, the most harm that will befall them from denial of the instant Motion is a temporary

inability to carry firearms for self protection while camping on Defendant Army Corps' property.[9] While the Court in no way means to downplay the importance of protecting individual rights, given the relatively uncertain nature of Second Amendment rights and the fact that the status quo is, and has been for some time, the continued enforcement of the Firearms Regulation, such a temporary setback to Plaintiffs' firearms use is relatively minor.

Contrastingly, should the Court grant Plaintiffs' Motion, the consequences to Defendant Army Corps and the public that enjoys recreating on Defendant Army Corps property

_____

[9]The Complaint makes clear that the Firearms Regulation has not dissuaded Plaintiff James from camping on Defendant Army Corps' property altogether. (See Compl. ¶ 17 ("[Plaintiff] James regularly camps on [Defendant Army Corps'] property and facilities at Lake Atoona [sic].").)

54

would be severe. Defendant Army Corps would not just have to change its rule on firearms, it would have to remold the entire regulatory framework governing recreation at recreational facilities. (See Austin Decl. ¶ 9 ("[Defendant Army] Corps would need to address a number of issues before changing the current regulation on the use and possession of firearms.").) This would likely include limitations on alcohol consumption, increased spending on protection for Park Rangers and outside police forces, and limitation of public services as a result of budgetary concerns. (Id. ¶ 10.) Indeed, should the Court order Defendant Army Corps to allow increased firearm use on its property, it is highly possible that Defendant Army Corps would have to, at least temporarily, close off its public

55

facilities altogether while it altered its operation to better deal with a more firearm saturated environment. Consequently, granting Plaintiffs' Motion, especially given the possibility, if not likelihood, that Defendants will eventually prevail on the merits of their claim would cause severe, possibly unnecessary, harm to Defendants and the public interest. The Court therefore finds that the balance of harms and public interest factors tip in favor denying Plaintiffs' Motion.

## E. Summary

For all the above reasons, the Court finds that Defendants are likely to prevail on the merits, that Plaintiffs will not be irreparably harmed should the Court deny their Motion, that the balance of harms tips in favor of

AO 72A

(Rev.8/8 2)

Defendants, and that the public interest would be harmed if the Court were to grant Plaintiffs' Motion. Further, the above discussion aside, all Parties surely agree that the law governing Second Amendment rights is in its infancy and that the allegations in this case are relatively untested. Given these circumstances, the Court finds it appropriate to maintain the status quo until the Parties' rights can be fully and fairly adjudicated. See Suntrust Bank, 268 F.3d at 1265 ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.") (internal quotation marks and citation omitted). Consequently, the Court denies Plaintiffs' Motion for Preliminary Injunction.

57

## IV.  Conclusion

ACCORDINGLY, the Court **DENIES** Plaintiffs' Motion

for Preliminary Injunction [5].

IT IS SO ORDERED, this the $\underline{18}$ day of August, 2014.

_____

UNITED STATES DISTRICT JUDGE